THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GERALD RICE, Defendant-Appellant.

First District (5th Division)   No. 1—88—3011

Opinion filed December 23, 1993.

O'Connor & Kelley, of Chicago (William J. O'Connor, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Margaret Faustmann, and Fabio Valentini, Assistant State's Attorneys, of counsel), for the People.

JUSTICE COUSINS delivered the opinion of the court:

Following a bench trial, defendant, Gerald Rice (Rice), was convicted of arson, aggravated arson, and four counts of murder. The trial judge sentenced him to life imprisonment. On appeal, Rice argues that: (1) the trial judge erred by failing to *sua sponte* hold a hearing regarding Rice's competency to stand trial; (2) trial counsel's failure to request an evidentiary hearing on Rice's competency to stand trial constituted ineffective assistance of counsel; (3) the trial court erred in finding that Rice knowingly and intelligently waived his *Miranda* rights before giving a statement; and (4) the imposition of a mandatory life sentence upon a 16-year-old mentally retarded defendant violates the eighth amendment's prohibition against cruel and unusual punishment.

BACKGROUND

On the morning of July 24, 1986, Detective Richard Schak of the Chicago police department went to 1107 North Massasoit Street to investigate an arson homicide. An eyewitness gave Detective Schak a description of one of the suspects, and that description matched the physical appearance of Rice. At approximately 5 a.m., Detective Schak located Rice in the alley behind the burning house and placed him under arrest. Another officer transported Rice to Area 5 and placed him in an interview room.

At approximately 6 a.m., Detective Schak had a conversation with Rice. He testified that he gave Rice *Miranda* warnings and Rice stated that he understood. Rice denied any involvement in the crime at this time. He told Detective Schak that he was at home in bed when a person known as "Duck" pounded on his door and told him that there was a fire. He then went outside with Duck and stood in the alley watching the fire until he was approached by Detective Schak. This first conversation lasted about 10 minutes and then Detective Schak left the police station to conduct further investigation.

Sometime between 8 and 8:30 a.m., Detective Schak returned and had a second conversation with Rice. Schak testified that he repeated

the *Miranda* warnings at this time, and Rice indicated that he understood his rights. During this second conversation, Rice confessed that he had participated in setting the fire.

About 11 a.m., a third conversation took place; Detective Schak, Assistant State's Attorney Kevin Horan (ASA Horan), and Rice were present. Both Detective Schak and ASA Horan testified that Horan advised Rice of his *Miranda* rights, and Rice indicated that he understood his rights. Rice gave a statement detailing his involvement in the arson to ASA Horan at this time. Detective Schak testified that after the statement was concluded, he, ASA Horan and Rice drove out to the scene of the crime, where Rice proceeded to reenact the events leading up to the arson.

On November 12, 1986, approximately $1^{1}/_{2}$ years prior to trial, Dr. Markos of the Psychiatric Institute of the circuit court of Cook County found Rice unfit to stand trial. In his report, Markos stated that Rice appeared to have mild mental retardation with atypical depression. He concluded that although Rice understood the charges against him, his ability to understand the legal proceedings and the functions of various courtroom officials was limited. Markos opined that Rice would be restored to fitness within one year if he was given appropriate psychiatric supervision and treatment.

In November of 1987, Rice was subject to extensive testing by psychiatrists at the ISAAC Ray Center. After analyzing all of the test results and data gathered through interviews, Dr. Phyllis E. Amabile prepared a detailed report in which she concluded that Rice was competent to stand trial.

On May 23, 1988, Dr. Markos prepared a second psychological report concerning Rice's fitness to stand trial. Consistent with his prognosis in 1986, Dr. Markos concluded that Rice was now fit to stand trial. No fitness hearing was held.

On June 6 and 7, 1988, an evidentiary hearing was held on Rice's motion to suppress his confession. Rice argued that he did not receive *Miranda* warnings, and even if he had received warnings, he lacked the capacity to comprehend them. The trial court denied the motion finding that Rice was given *Miranda* warnings, he understood them, and he voluntarily gave a statement.

Following a bench trial, the judge found Rice guilty of arson, aggravated arson and four counts of murder. He sentenced Rice to a term of natural life imprisonment, and this appeal followed.

ANALYSIS

I

Initially, Rice contends that the trial court erred in failing to

hold a hearing on the issue of his competency to stand trial. Rice concedes that his attorney did not request such a hearing, but argues that the trial court had a duty to order, *sua sponte*, a fitness hearing.

Conviction of a person who is unfit to stand trial violates due process. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 56.) A defendant is considered unfit to stand trial if, because of mental or physical problems, he is unable to understand the nature and purpose of proceedings against him or to assist in his defense. (Ill. Rev. Stat. 1985, ch. 38, par. 104—10.) However, there is a presumption that a defendant is mentally fit. (Ill. Rev. Stat. 1985, ch. 38, par. 104—10.) Furthermore, the trial judge is not obligated to conduct a hearing to determine a defendant's fitness unless a *bona fide* doubt about defendant's fitness to stand trial has been raised. (Ill. Rev. Stat. 1985, ch. 38, par. 104—11; *People v. Eddmonds* (1991), 143 Ill. 2d 501, 512.) The determination of whether or not a *bona fide* doubt of fitness has been raised rests within the sound discretion of the trial court (*Eddmonds*, 101 Ill. 2d at 56; *People v. Murphy* (1978), 72 Ill. 2d 421, 431), and the trial court's refusal to hold a fitness hearing will not be overturned, absent a clear abuse of that discretion. *People v. Brown* (1985), 131 Ill. App. 3d 859, 863; *People v. Wilson* (1984), 124 Ill. App. 3d 831, 836.

Rice contends that it is apparent from the record that a *bona fide* doubt existed about his competency and directs our attention to the following facts. First, defense counsel filed a motion to suppress in which he stated that Rice was 16 years of age and suffered from learning and emotional disabilities. Second, on October 16, 1986, the first date of record in this case, the following exchange took place between the trial judge and the defendant:

"THE COURT: Mr. Rice, do you know your lawyer's name?
DEFENDANT: No.
THE COURT: Do you expect him to be here this morning?
DEFENDANT: Um-um. He didn't tell me nothing about this."

Third, on November 12, 1986, Dr. Markos of the Psychiatric Institute of the circuit court of Cook County found Rice unfit to stand trial. Fourth, on April 6, 1987, the trial judge acknowledged the need for a fitness hearing by stating, "we'll have some kind of hearing as to Mr. Rice and that will evidently be a fitness hearing." Fifth, at the hearing on the motion to suppress, Rice's mother testified that her son was "real slow," had difficulty understanding adult language and had been in a slow learning class since he was seven years old. Also during the hearing, the assistant State's Attorney who had interviewed Rice at the police station testified that he observed that Rice was "definitely slow." Sixth, the testimony of Dr. Hines and Dr. O'Donnell indicated that Rice was unfit.

■ It is undisputed that Rice is mentally impaired to some degree due to his condition of mild mental retardation. However, limited mental capacity is not sufficient of itself to raise a *bona fide* doubt of defendant's fitness to stand trial. (*Murphy,* 72 Ill. 2d at 432; *People v. James* (1980), 83 Ill. App. 3d 1078, 1082.) Thus, the question before this court is whether the trial court correctly determined that in spite of his handicap, Rice was able to understand the nature of the proceedings against him and assist in his defense.

The fact that Rice was unable to recall his attorney's name on the first date of record does not indicate that he was unfit to stand trial. Likewise, the fact that the trial judge was inclined to hold a fitness hearing more than one year prior to trial does not give rise to a *bona fide* doubt about Rice's fitness at the time of trial. On April 6, 1987, when the trial judge stated that he thought a fitness hearing should be held, the only psychological report which had been submitted to the court stated that Rice was unfit to stand trial. However, at the time of trial, the most recent psychological reports concluded that Rice was, in fact, fit to stand trial.

Next, although Rice argues that the testimony of Dr. Hines and Dr. O'Donnell indicates that he was unfit to stand trial, the record indicates otherwise. First, neither Dr. Hines nor Dr. O'Donnell submitted a report to the court. Second, Dr. Hines testified only about Rice's ability to understand *Miranda* warnings and did not give an opinion on Rice's overall competency. On the other hand, Dr. O'Donnell, who conceded that he did not perform any tests on Rice, stated that on the particular day that he interviewed Rice, he felt Rice was "not competent." It is unclear whether he meant competent to stand trial or competent to understand *Miranda* warnings.

While it is true that Dr. Markos found Rice unfit to stand trial in his 1986 report, he also opined that Rice might be restored to fitness within one year if he was given appropriate psychiatric supervision and treatment. Consistent with the prognosis made in 1986, Dr. Markos issued a second report on May 23, 1988, finding Rice fit to stand trial.

Furthermore, in November of 1987, Rice was subjected to extensive testing by psychiatrists at the ISSAC Ray Center and their reports were made part of the record. After analyzing the test results and data obtained through interviews with Rice, Dr. Phyllis E. Amabile concluded that Rice was competent to stand trial.

Finally, the trial judge was not limited to the reports and testimony of psychiatrists. The trial court had the opportunity to observe Rice himself when Rice testified at the motion to suppress. Based on its own observations of Rice, the trial court firmly believed that Rice was competent to stand trial:

"[I]t is clear to me that [Rice] is not as mentally acute as most of the defendants who come through this courtroom, but yet is not in a position where he is unable to stand for trial, and is fit for trial and did cooperate with his lawyer and understands the nature of the charges."

The facts in this case are similar to those presented to the supreme court in *Eddmonds* (101 Ill. 2d 44). In *Eddmonds*, an early psychiatrist's report stated that the defendant was unfit to stand trial, and defense counsel requested a fitness hearing. Subsequent reports determined that the defendant was fit to stand trial. Trial commenced and the defendant was convicted of murder and deviate sexual assault. On appeal to the supreme court, the defendant argued that a *bona fide* doubt about his fitness to stand trial had been raised and, therefore, the trial court erred in failing to hold a fitness hearing.

The supreme court disagreed, finding the following circumstances relevant to its determination: (1) at the time of trial, the most recent psychiatric reports available to the court tended to show that defendant was fit for trial; (2) defendant's counsel made no further request for a fitness hearing; (3) in addition, defendant testified lucidly at both the hearing on his motion to suppress evidence and at his trial; and (4) the only evidence of defendant's unfitness for trial was reports by one doctor who subsequently changed his opinion and of another doctor whose report of unfitness was made more than two years before trial. *Eddmonds*, 101 Ill. 2d at 56; see also *People v. Fields* (1990), 199 Ill. App. 3d 888.

In the instant case, like *Eddmonds*, the most recent reports indicated that Rice was fit to stand trial; defense counsel did not pursue a fitness hearing; the trial court observed that Rice testified lucidly at the motion to suppress; and the only evidence of Rice's unfitness was a report by one doctor who subsequently changed his opinion and the ambiguous testimony of another doctor. On these facts, we find no abuse of discretion in failing to hold a fitness hearing.

## II

Rice next contends that trial counsel's failure to request an evidentiary hearing on Rice's competency to stand trial constituted ineffective assistance of counsel.

Whether a defendant has been given effective assistance of counsel is to be determined under the standard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, and adopted by our supreme court in *People v. Albanese* (1984),

104 Ill. 2d 504, 524-27. A defendant must demonstrate that counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's errors, the fact finder would have had reached a different result. *Strickland*, 466 U.S. at 687-95, 80 L. Ed. 2d at 693-98, 104 S. Ct. at 2064-68.

■ Having determined that the record supports the conclusion that there was no *bona fide* doubt of Rice's fitness to stand trial, we find that the failure of defense counsel to request a fitness hearing is not indicative of a lack of adequate representation. See *Murphy*, 72 Ill. 2d at 436; *People v. Mireles* (1979), 79 Ill. App. 3d 173, 190.

### III

Rice next contends that the trial court erred in refusing to suppress the confession he gave while in police custody. He argues that the statement was taken in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, because he was unable to comprehend the meaning of the *Miranda* warnings he was given.

The purpose of advising an accused of his *Miranda* rights is to enable him to make an intelligent decision and to understand the consequences of that decision. (*People v. Turner* (1973), 56 Ill. 2d 201, 205.) Therefore, a *Miranda* waiver must be knowing and intelligent, as well as voluntary. (*People v. Bernasco* (1990), 138 Ill. 2d 349.) It is well established that "the mental capacity of a defendant must be taken into consideration in determining whether his actions were voluntary [citation] and while mental deficiency, of itself, does not render a confession involuntary [citation] it is a factor which must be considered in the totality of the circumstances under which the right to counsel was waived or a statement or confession made." *Turner*, 56 Ill. 2d at 206.

At the motion to suppress, Detective Schak testified that the first time he spoke with Rice, he advised him of his *Miranda* rights in the following manner:

"I told Mr. Rice first that he had a right to remain silent. And he asked me what that meant. I told him that meant that he didn't have to talk to me or anybody else about this case if he didn't want to. I asked him if he understood that and he told me that he did.

I told him that anything he would say to me could be used against him in a court of law. And he asked me what that meant. I told him, well, in a court where there is a judge and attorneys, if you were charged with anything, that anything you told me could be used against you in that proceeding. And I asked him if he understood and he told me that he did.

I told him he had the right to have an attorney present during any questioning. He asked me if an attorney was the same thing as a lawyer. I told him that it was. I asked him if he understood and he told me that he did.

I also told him if he couldn't afford to have a lawyer, one could be appointed for him by the court if he so desired. I asked him if he understood and he did.

I also told him because he was 16 years old, that if he were to be charged, he wouldn't go to the juvenile court on Hamilton, that he would go to the adult court at 26th and California and be tried in court as if he were an adult, as if he were older and not in a juvenile court. And I asked him if he understood that and he told me he did.

I then asked him if he wanted to talk to me. He said he had no problem, he would talk to me."

Detective Schak testified that the second time he spoke with Rice he repeated the *Miranda* warnings to Rice, and Rice indicated that he understood his rights. Both Detective Schak and ASA Horan testified that Horan advised Rice of his *Miranda* rights before Rice gave an incriminating statement to Horan during the third conversation. Detective Schak testified that he did not strike or beat Rice at any time.

In contrast to Detective Schak's testimony, Rice testified that he was not given his *Miranda* warnings. He stated that Officer Schak hit him in the chest approximately seven times. He also testified that the officers took him back to the scene of the crime and threatened to beat him up in front of the people watching the fire.

Two psychologists testified on behalf of Rice. Dr. Hines testified that he conducted several intelligence tests on Rice and determined that his ability to understand was quite poor. He opined that it would have been extremely difficult for Rice to have comprehended his *Miranda* rights. On cross-examination, however, Dr. Hines conceded that he did not specifically question Rice about his understanding of *Miranda* warnings. He failed to ask Rice if he had received *Miranda* warnings. He also did not ask Rice if he understood what it means when someone says "you have a right to remain silent," or "anything you say, can be used against you in a court of law."

Dr. O'Donnell testified that he interviewed Rice while he was incarcerated in the Cook County jail. He stated that he did not perform any tests on Rice, but he did read reports prepared by other psychiatrists in 1986 and 1987. He testified that Rice had difficulty understanding simple questions and seemed to get confused easily. He stated that Rice was not competent at the time he had interviewed

him. On cross-examination, Dr. O'Donnell conceded that he did not have any conversations with Rice regarding *Miranda* warnings.

As Rice points out, the trial judge initially stated that it was impossible for him to make a ruling about whether Rice understood the *Miranda* warnings since Rice denied receiving any warnings. However, the trial judge subsequently determined that Rice did, in fact, understand the warnings:

> "[I]n viewing all of the evidence in totality and after listening to Mr. Rice testify, I find that he is able to understand the questions which are put to him and statements which are made. *** As a credibility issue, I choose to believe that he was given his warnings, that he did understand them, and he did waive them. *** I believe that [Rice's statement] is competent evidence, that it was voluntarily made, and, therefore, I am going to admit it into evidence."

■ In this case, the trial judge was well apprised of Rice's mental deficiency. Armed with knowledge of Rice's limitations, the trial judge observed Rice as he testified and evaluated the degree to which his mental deficiency impaired his ability to comprehend legal concepts. The trial judge also observed Rice's ability to communicate both his understanding and his lack of understanding to others. In addition, the trial judge was able to observe the demeanor and judge the credibility of Detective Schak, ASA Horan and the psychologists who testified on Rice's behalf. The validity of a waiver of rights is a question of fact, and as a reviewing court, we must give deference to the trial court's findings of fact. (*Bernasco*, 138 Ill. 2d at 364, 368.) A trial court's determination on a motion to suppress evidence will not be disturbed unless it is against the manifest weight of the evidence. (*Bernasco*, 138 Ill. 2d at 368.) After careful review, we conclude that the trial court's findings were not against the manifest weight of the evidence.

## IV

Finally, Rice contends that the imposition of a mandatory life sentence upon a 16-year-old mildly mentally retarded defendant without providing him the opportunity to present evidence in mitigation violates the eighth amendment's prohibition against cruel and unusual punishment. Specifically, Rice challenges the constitutionality of section 5—8—1(a)(1)(c) of the Unified Code of Corrections, which provides in relevant part:

> "A sentence of imprisonment for a felony shall be a determinative sentence set by the court under this Section, according to the following limitations:
> (1) for murder, *** (c) if the defendant has previously been

convicted \*\*\* or is found guilty of murdering more than one victim, the court shall sentence the defendant to a term of natural life imprisonment." Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(c).

It is within the province of the legislature to define offenses and determine the penalties required to protect the interests of our society; such legislation will not be nullified by courts unless it violates a constitutionally assured right. (*People v. Taylor* (1984), 102 Ill. 2d 201, 206.) This court has repeatedly held that section 5—8—1(a)(1)(c) does not violate the eighth amendment to the United States Constitution. See, *e.g.*, *People v. Matthews* (1990), 205 Ill. App. 3d 371, 416-17; *People v. Foster* (1990), 198 Ill. App. 3d 986, 1000-01; *People v. Rodriguez* (1985), 134 Ill. App. 3d 582, 593-94.

For all of the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

MURRAY and McNULTY, JJ., concur.