Gerald RICE, Petitioner–Appellant,

v.

Keith COOPER, Respondent–Appellee.

No. 97–2821.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 13, 1998.

Decided June 19, 1998.

Raymond D. Pijon (argued), Chicago, IL, for Petitioner–Appellant.

Lorna Trinidad DeLeon Amado (argued), Office of the Attorney General, Chicago, IL, for Respondent–Appellee.

Before POSNER, Chief Judge, and MANION and ROVNER, Circuit Judges.

POSNER, Chief Judge.

In 1986 an illiterate and mildly retarded 16–year–old named Gerald Rice, encouraged by two friends, tossed a bottle of gasoline into an apartment building in Chicago. The bottle exploded, setting a fire that killed four residents of the building. Rice, who was arrested immediately and confessed a little later, was convicted in state court of first-degree murder and sentenced to natural life in prison. One of his friends was acquitted; the other was not charged. After exhausting his state remedies, see *People v. Rice*, 257 Ill.App.3d 220, 195 Ill.Dec. 373, 628 N.E.2d 837 (1993), Rice sought habeas corpus in federal district court, lost there, and appeals. His appeal is governed by the "old law" of federal habeas corpus, because he sought habeas corpus before the Antiterrorism and Effective Death Penalty Act became operative.

The appeal raises four issues: whether there should have been a hearing on Rice's mental competence to stand trial; whether his lawyer rendered ineffective assistance by failing to request such a hearing; whether Rice made a valid waiver of his *Miranda* rights when he was arrested and questioned; and whether sentencing a retarded juvenile to life in prison is a cruel and unusual punishment.

In November of 1986, a psychiatrist on the staff of the state criminal court, Mathew Markos, examined Rice at the direction of the court and concluded that he was unfit to stand trial. Markos opined that Rice had "atypical depression," meaning a depressive episode with atypical features, American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM–IV) 386 (4th ed.1994), and "mild mental retardation" (alternatively described as "dull average intellectual functioning"). Markos believed that while Rice understood the charge against him, his ability to understand the legal proceedings was limited and he was unable to cooperate with defense counsel, but that "with appropriate psychiatric supervision and treatment, he should be restored to fitness within one year." Eighteen months later, Markos again examined Rice (who had spent the intervening time in jail), and this time found that he was fit to stand trial. Although Rice still had atypical depression and mild mental retardation, his overall mental condition was much improved. He now had, in Markos's opinion anyway, an adequate understanding of the proceedings and was able to cooperate with defense counsel. And in between Dr. Markos's two reports, another psychiatrist, Phyllis Amabile, had examined Rice and also found him fit to stand trial, though her examination was superficial because it did not include any observations of Rice talking with his lawyer. The trial judge, who watched Rice testify, believed him competent to stand trial.

Rice points out that two psychologists testified that he had been mentally incompetent to waive his rights under *Miranda* when he had been arrested in 1986. But remember that Markos, too, had thought Rice incompetent (albeit to stand trial rather than to waive *Miranda*) in 1986 but had thought him competent in 1988. One of the psychologists did state that Rice was incompetent to stand trial, but it was an offhand comment; and so the great weight of the expert opinion before the trial judge in 1988, confirmed by the judge's own observations of Rice, who by then had testified, was that Rice was fit to

stand trial. In these circumstances, the failure to conduct an evidentiary hearing on Rice's competence did not deny him due process. *Galowski v. Berge*, 78 F.3d 1176, 1181–82 (7th Cir.1996); *United States ex rel. Lewis v. Lane*, 822 F.2d 703, 706–07 (7th Cir. 1987); *Cremeans v. Chapleau*, 62 F.3d 167 (6th Cir.1995); cf. *Reynolds v. Norris*, 86 F.3d 796, 800–02 (8th Cir.1996).

■ Rice argues that his trial counsel was ineffective because he did not request such a hearing. This argument is not foreclosed by our conclusion that the failure to hold a hearing was not a denial of due process; a hearing could be helpful to a defendant even if not so indispensable to the making of a rational decision as to be required by the Constitution. But Rice has not sought an affidavit from the lawyer to explain the lawyer's strategy and has not indicated what a hearing would have done to dent, let alone refute, the expert evidence that the judge credited. He thus has failed to lay a foundation for a claim of ineffective assistance of counsel, for on the record as it stands there is no basis for thinking that a competent lawyer would have challenged the Markos and Amabile reports or that if he had it would have changed the result. See *Gilbert v. Moore*, 134 F.3d 642, 654–55 (4th Cir.1998) (en banc); *Six v. Delo*, 94 F.3d 469, 473–74 (8th Cir.1996). Rice can get no help from the fact that at the time Illinois law entitled a defendant who was taking psychotropic drugs (as Markos's second report revealed that Rice was for treatment of his depression, without however indicating—and the record does not reveal—which drugs) to a competency hearing. 725 ILCS 5/104-21(a)(1992). Defendants often have procedural entitlements that are not worth claiming in a particular case. There is, to repeat, no indication that a hearing would have led to a determination that Rice was incompetent to stand trial.

■ Whether the incriminating statements that Rice made at the time of his arrest after waiving his right to remain silent or consult a lawyer should have been suppressed because of his mental condition raises the interesting general question of the duty, if any, of the police to protect a mentally impaired person from incriminating himself. A confession or other admission is not deemed coerced or involuntary merely because it would not have been made had the defendant not been mentally defective or deranged. *Colorado v. Connelly*, 479 U.S. 157, 169–71, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). The relevant constitutional principles are aimed not at protecting people from themselves but at curbing abusive practices by public officers. From this it might be argued that officers are free to recite the standard *Miranda* warnings to anyone they arrest, regardless of the person's evident mental condition, and to accept the person's waiver. But this has to be wrong, though we cannot find a case that says so. If the suspect is a small child, or if it is apparent that he cannot speak English, then attempting to extract a waiver of *Miranda* rights is pretty obviously an abusive practice, as it is a calculated, conscious effort to extract a decision that is not the product of a rational choice. And likewise if it is apparent that because of illness, insanity, or mental retardation the suspect is incapable of rationally waiving his *Miranda* rights. The significance of the principle of *Connelly*, the principle that the Constitution doesn't protect the suspect against himself, is that if he understands the *Miranda* warnings yet is moved by a crazy impulse to blurt out a confession, the confession is admissible because it is not a product of coercion. The police have given him his *Miranda* warnings in an intelligible form; it is not their fault that he is impulsive. It is different, if perhaps only by a shade, if the police question him knowing that he does not understand his rights.

■ On this analysis, the knowledge of the police is vital. If they have no reason (there was none in *Connelly*, see 479 U.S. at 161–62, 107 S.Ct. 515) to think that the suspect doesn't understand them, there is nothing that smacks of abusive behavior. It would seem to follow that the question is not whether if Rice were more intelligent, informed, balanced, and so forth he would not have waived his *Miranda* rights, but whether the police believed he understood their explanation of those rights; more precisely,

whether a reasonable state court judge could have found that the police believed this. *Henderson v. DeTella*, 97 F.3d 942, 946 (7th Cir.1996); *Jones v. Page*, 76 F.3d 831, 852 (7th Cir.1996). The police testified that at the outset of the questioning Rice did not appear to be incapable of understanding what was going on. So there was no element of abuse in the giving of the *Miranda* warnings envisaged as the first stage of an interrogation. But it immediately appeared that Rice did have some problems understanding the warnings. The interrogating officer testified that he "told Mr. Rice first that he had a right to remain silent. And he asked me what that meant. I told him that meant that he didn't have to talk to me or anybody else about this case if he didn't want to. I asked him if he understood that and he told me that he did." This pattern was repeated throughout the giving of the *Miranda* warnings— Rice expressing a lack of understanding, the officer trying to explain, Rice then signifying his understanding. For example, "I told him he had the right to have an attorney present during any questioning. He asked me if an attorney was the same thing as a lawyer. I told him that it was. I asked him if he understood and he told me that he did."

This pattern is consistent with Rice's having, to the best of the police officers' knowledge, understood the warnings sufficiently to be able to waive them knowingly. He did not understand them at first, and when he signified his lack of understanding to the interrogating officer this put the latter on notice that if he wanted to obtain an effective waiver he had better explain the *Miranda* rights to Rice in the simplest possible manner. Which is what he tried to do. And the questions that Rice asked, such as whether an attorney is the same as a lawyer, while they indicate a lack of legal and intellectual sophistication, do not evince such a profound derangement as would require (as in *Moore v. Ballone*, 658 F.2d 218, 229 and n. 7 (4th Cir.1981)) the suppression of his statements on the ground that there was no effective waiver—and the police knew it but persisted in questioning him.

Our emphasis on the absence of police abuse is, however, in tension with the conventional approach to waivers of the *Miranda* rights—that of asking simply whether the defendant had the maturity, competence, etc. to make a knowing waiver of his rights, e.g., *Colorado v. Spring*, 479 U.S. 564, 573–74, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987); *Fare v. Michael C.*, 442 U.S. 707, 725–26, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *Henderson v. DeTella*, *supra*, 97 F.3d at 946; *United States v. Male Juvenile*, 121 F.3d 34, 40–41 (2d Cir.1997), without reference to what the police knew or should have known. On the authority of *Spring*, two cases hold that a distinction must be made between an unknowing waiver, invalid even if not the result of any police misconduct, and an involuntary waiver, invalid only if it is the result of such misconduct. *United States v. Bradshaw*, 935 F.2d 295, 298–300 (D.C.Cir.1991); *Derrick v. Peterson*, 924 F.2d 813, 820–21 (9th Cir.1990). It is not a satisfactory distinction, as both of these decisions recognize. See 935 F.2d at 299–300, 924 F.2d at 820–21. If Connelly's waiver of his Fifth Amendment right not to confess was effective even though the confession was induced by madness rather than by remorse or calculation, why should a waiver of *Miranda* rights be ineffective if prompted solely by the defendant's mental condition rather by anything the police did? Because "waiver" in law is defined as a knowing relinquishment of a right? But Connelly waived a right more fundamental than that conferred by *Miranda*—the right to remain silent, the right that *Miranda* backs up by requiring specific warnings. From the standpoint of the policies that inform the self-incrimination and due process clauses of the Constitution, Connelly's action in blurting out a confession because of an irresistible impulse to confess is difficult to distinguish from a suspect's confessing because of an inability (not known or apparent to his interrogators) to understand his right not to confess. In neither case is there a responsible relinquishment of rights; in neither is there police misconduct; in both the government receives a windfall as a result of the suspect's mental abnormality.

Maybe the real difference between the two cases is that judges are more confident about being able to determine whether a suspect understands the *Miranda* warnings than

about being able to determine whether he waived them because he was remorseful, calculating, or merely impulsive, on the one hand, or mentally ill or deficient on the other. It is generally easier to infer whether someone understands something—a type of inference we draw all the time, as it is fundamental to human communication—than it is to infer the motives that prompt a person to react in one way rather than another to particular information. It is a considerable mystery why people *ever* confess to a crime if they are not coerced; and deciding whether and in what sense a confession can be said to be "involuntary" when it is not the product of coercion may be beyond the practical competence of the courts. But we need not pursue this issue further; there was neither police abuse nor compelling evidence of Rice's incapacity to make a knowing waiver of his *Miranda* rights after the police explained in simple terms what those rights were.

The last issue is the sentence. A sentence of natural life in prison (that is, imprisonment till Rice dies or his sentence is commuted, because there is neither a term of years nor the possibility of parole) is exceptionally severe when the defendant is a minor and suffers from deficits of understanding, even if they are not such deficits as would preclude him from being forced to stand trial and from being convicted. But we cannot find any basis in decisions interpreting the Eighth Amendment, or in any other source of guidance to the meaning of "cruel and unusual punishments," for concluding that the sentence in this case was unconstitutionally severe. It was not disproportionate to the crime, which was the murder of four persons. Rice may have been unlucky that his crime produced multiple victims. But society attaches moral significance to consequences as well as to states of mind. *United States v. Martinez,* 16 F.3d 202, 205–06 (7th Cir.1994); *United States v. Tham,* 118 F.3d 1501, 1507 (11th Cir.1997); *United States v. Smith,* 27 F.3d 649, 653 (D.C.Cir.1994); see also *Payne v. Tennessee,* 501 U.S. 808, 819, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). And Rice was morally responsible in the further sense of having sufficient mental capacity to form the intent required to be found guilty of the crime.

When the severity of the sentence is not disproportionate to the gravity of the crime, and (as the cases neglect to add, although it seems to us an inescapable consideration for a criminal justice system that claims to be civilized) the defendant is fully responsible in both the moral and the legal sense for the crime, there is no basis for deeming the sentence unconstitutionally severe. *Harmelin v. Michigan,* 501 U.S. 957, 996–1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (plurality opinion).

This is not to deny that Rice's youth, and the mysterious inability of the law to bring his accomplices, who seem to have been more culpable for the murders than Rice, to justice, argue for a lighter sentence. And the sentencing judge made clear that he would have imposed a lighter sentence—except that Illinois law makes natural life in prison mandatory for a murderer of more than one person. 730 ILCS 5/5-8-1(a)(1)(c)(ii). So the question becomes whether such a law, because it prevents the consideration of mitigating factors, violates the cruel and unusual punishments clause. It does not. The Supreme Court has rejected the argument that mandatory penalties, including life imprisonment without parole (though not capital punishment), are unconstitutional just because (by definition) they prevent the consideration of mitigating factors. *Harmelin v. Michigan, supra,* 501 U.S. at 994–96, 111 S.Ct. 2680; see *United States v. Magana,* 118 F.3d 1173, 1209 (7th Cir.1997); *Rodriguez v. Peters,* 63 F.3d 546, 566–68 (7th Cir.1995).

Affirmed.