No. 2--04--1158

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | No. 04--CF--794 |
| v. | ) ) ) | |
| PHILLIP A. MEYERS, | ) ) | Honorable Timothy Q. Sheldon, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE O'MALLEY delivered the opinion of the court:

Following a jury trial, defendant, Phillip A. Meyers, was convicted of resisting a peace officer (720 ILCS 5/31--1(a--7) (West 2002)) and aggravated battery of a peace officer (720 ILCS 5/12--4(b)(6) (West 2002)). On appeal, he argues that the trial court erred by failing to conduct a hearing on his fitness to stand trial and by allowing the State to present evidence of his prior conviction of aggravated fleeing or attempting to elude a police officer (625 ILCS 5/11--204.1 (West 2000)). We affirm.

Defendant's fitness to stand trial was addressed in a prior decision of this court, People v. Meyers, 352 Ill. App. 3d 790 (2004), which we will summarize here because of its relevance to the fitness issue in the present case. In Meyers, defendant was charged with crimes arising out of an April 18, 2001, altercation with police officers from the City of

Aurora.  At his bond hearing, defendant stated that the Aurora police, together with law enforcement officers from Du Page County and Naperville, had beaten him and threatened him with death.  Defendant also claimed that the police had robbed his apartment. Defendant then said to the trial court, " 'I guess that means that you will kill me here, I guess.' " Meyers, 352 Ill. App. 3d at 792.  At the request of defense counsel, the trial court ordered that defendant undergo a psychological evaluation.  At a later hearing, defendant stated that he refused to undergo an evaluation and that he wanted his attorney fired.  The trial court ordered defendant to cooperate with the examination.  Several days later, a report was filed stating that defendant was fit to stand trial.  At a subsequent hearing, the trial court asked defendant if he considered himself fit to stand trial, and defendant said that he did.  The trial court then found defendant fit, based on his statement and the report that had been filed.  Meyers, 352 Ill. App. 3d at 792.

At defendant's February 4, 2002, pretrial hearing, the issue of fitness was again raised.  Regina Harris, an attorney whom the trial court described as an expert on mental health issues, opined that defendant exhibited " 'a great deal of agitation,' " and possible mania, but she did not believe that defendant had an " 'active psychotic process.' " Meyers, 352 Ill. App. 3d at 793.  Harris said that defendant " '[s]eems convinced that his attorney is not working for him, perhaps is even working against him.' " Meyers, 352 Ill. App. 3d at 793.  The trial judge observed, based on his experience, that defendant seemed to have " 'paranoia.' " Meyers, 352 Ill. App. 3d at 793.  The trial court then noted that defendant was currently laughing hysterically at counsel table.  Finding that the issue of fitness was sufficiently raised, the trial court removed the case from the trial calendar and arranged for defendant to be evaluated immediately by Dr. Timothy Brown.  Defendant pointed at the

trial judge and said, " 'I don't know what you think you're doing. I'm never going to speak to a psychiatrist. Do you understand what I'm saying? I already did. You keep bullshitting around. You a [sic] bitch. Punk.' " A recess was taken, during which Dr. Brown evaluated defendant. When court resumed, Dr. Brown testified, leading to the following exchange:

" 'THE COURT: Have you had a chance to interview him? And the defendant

is in the courtroom. If you could report to the Court, please, on the issue for fitness

for trial today.

DR. BROWN: It is my opinion that Mr. Meyer [sic] is not fit to stand trial. He

is

unable to control his behavior in the courtroom and he is unable to cooperate and

assist in the preparation of his defense as a result of a mental illness.

THE DEFENDANT: I ain't even talked to this guy. You mother fuckers are

stupid,

man.

DR. BROWN: That would be an example of it.

THE COURT: What else would you like to say, sir?

THE DEFENDANT: Well, I got warrants, man, in Du Page County where you

all

refused to take me to court. *** And if you all think you're going on with the trial,

you need to give me an I bond so I can get out of here and because I don't need to

be fucked with. You [sic] stupid. You know you're stupid, man. You're the stupidest

one of all.

THE COURT: Let the record also reflect that the colloquy that just started--

THE DEFENDANT: I ain't even talked to that guy.

THE COURT: --started with a burst of laughter that was not--

THE DEFENDANT: First call you [sic] momma.

THE COURT: What else would you like to say?

THE DEFENDANT: What else you got [sic] to say?

THE COURT: I'm going to based on the testimony at this time find that you are not

fit for trial and I'm going to order a continued examination and continue this ***.

THE DEFENDANT: I'm never going to talk to him. So that means you're never

going to go to mother fucking trial. Dick head Doyle.' (Emphasis added.) " Meyers, 352 Ill. App. 3d at 793-94.

The trial court asked defendant, " 'Are you done now?' " Defendant replied, " 'You going [sic] to be done.' " Meyers, 352 Ill. App. 3d at 794. The trial court then ordered defendant removed from the courtroom. Defendant called the trial court a "bitch" and flashed what the court described as the " 'universal signal of discontent.' " Meyers, 352 Ill. App. 3d at 794. After defendant left, the trial court found him not fit to stand trial. Meyers, 352 Ill. App. 3d at 794.

Several days later, based on defense counsel's representation that he failed to apprise defendant of his right to have a jury determine his fitness, the trial court entered an order vacating the February 4, 2002, finding of unfitness. A month later, defendant

appeared with new counsel. Based on counsel's opinion that defendant was now fit to stand trial, the trial court set the matter for trial. Meyers, 352 Ill. App. 3d at 795.

A jury trial was held on March 25, 2002. The following day, the jury returned verdicts of guilty. During on-the-record discussions following the verdict, defendant said something unintelligible. The trial court asked defendant to repeat himself, and the following colloquy ensued:

" 'THE DEFENDANT: You heard what the fucking [sic] I said, man.

THE COURT: All right. Here's what I'm going to do. I've been real patient with you the last time.

THE DEFENDANT: I've been patient with you motherfuckers, too. Fuck this, man.

THE COURT: You know what? So right now--

THE DEFENDANT: Right now, kiss my ass, man.

THE COURT: Okay, I'm holding you in direct contempt of court[.]

THE DEFENDANT: Hold your momma.

THE COURT: You know what? I'm going to hold you in contempt of court right now and I'm sentencing you to six months right now for your conduct right now.

THE DEFENDANT: I don't give a fuck about what you [sic] going to do, bitch. What the fuck. Hey, man, don't pull on me. What you do [sic], don't pull on me. I'm telling you, man. Don't push on me. Get your damn hands off of me, man.' "

Meyers, 352 Ill. App. 3d at 795-96.

At a later hearing, the trial court discussed a letter it had requested from Dr. Brown containing his reasons for his prior finding that defendant was unfit. According to our description in Meyers:

" 'The letter contains a number of Dr. Brown's findings and observations as to defendant's fitness to stand trial, including: (1) that defendant's judgment was grossly impaired; (2) that defendant was irrational; (3) that defendant did not appreciate that the court "had the ability to take control of him, restrict his freedom, and try him on criminal charges"; (4) that defendant was "angrily out of control" while in court; (5) that defendant is "suffering from a psychotic disorder in which his mood fluctuates rapidly"; (6) that defendant is "suspicious, distrustful, aggressive, and most likely delusional"; (7) that defendant "lacks the capacity to cooperate with his attorney"; (8) that defendant "does not appreciate the nature and purpose of the proceeding against him"; and (9) that, to a reasonable degree of psychiatric certainty, defendant is not fit to stand trial.' " Meyers, 352 Ill. App. 3d at 796.

The trial court rejected the conclusion of the report, noting that defendant was a " ' gentleman at all times' " during his testimony before the jury and that he knew " 'exactly what he was doing.' " Meyers, 352 Ill. App. 3d at 796. We noted that "[t]he trial court then, apparently, determined that defendant had been fit during the trial, although it made no explicit finding on the subject." Meyers, 352 Ill. App. 3d at 797.

On appeal, defendant argued that a bona fide doubt existed as to his fitness prior to trial and that it was error to proceed to trial without a fitness hearing. We agreed, citing "the testimony and opinions of Dr. Brown, Harris, and the trial judge himself regarding the cause of defendant's repeated outbursts." Meyers, 352 Ill. App. 3d at 799. We further noted that

"the fact that the trial court actually found defendant unfit at one point provides a strong indication that defendant was, in fact, unfit." Meyers, 352 Ill. App. 3d at 798. We reversed defendant's conviction and remanded for a fitness hearing.

Defendant suggests that "the record in this case reveals that no fitness hearing was ever conducted after this court's remand order in Meyers." We would not necessarily expect the record in this case to indicate whether or not defendant underwent a fitness hearing upon remand in Meyers, because Meyers was an entirely separate case. Nevertheless, the State appears to agree with defendant that no subsequent fitness hearing ever took place. The State suggests that the prosecution "apparently chose not to retry defendant." For our purposes here, we assume that no fitness hearing took place.

Moving to the facts of this case, we note that, at defendant's first appearance in the proceedings below, the trial court asked if he wanted the public defender to represent him. Defendant replied in the affirmative and added:

"I also probably *** want a speedy trial. 'Cause I intend on subpoenaing Appellate Court lawyers and all types of stuff because it's a fake charge. They told me they was going to do this to me."

In response to later questions from the trial court, defendant said:

"I was in prison and the Appellate Court had to get me out of prison because Kane

County refused to give me a mittimus. And when they read the papers, they figured Kane County think they can make up they [sic] own laws or something. That didn't work."

Asked if he possessed any real or personal property, defendant replied, "No, they took everything from me." With the exception of a brief colloquy when he waived his right to a 12-person jury and opted for a 6-person jury, defendant said nothing on the record until he testified in his own defense at trial.

Prior to trial, the State filed a motion in limine to introduce evidence of defendant's prior convictions of criminal damage to government-supported property, aggravated fleeing or attempting to elude a police officer, and aggravated battery of a police officer. When first presented with the motion, the trial court told defense counsel: "You know, I normally allow a conviction." The trial court then found the convictions to be "more probative than prejudicial, in that they reflect upon the defendant's credibility." Following the arguments of the parties, the trial court ruled that the State could use only one of the three convictions:

> "I would rule that you may use one, because I think you will test his credibility with
> one conviction the same as you would with two or more, and that two or more may
> be more prejudicial than probative."

The trial court left it to the State to choose which conviction to use at trial.

Defendant was tried on July 26, 2004. The evidence revolved around an encounter between defendant and police officers that took place at Hessed House, a homeless shelter in Aurora. The director of the shelter testified that she summoned police officers after she saw defendant standing outside the shelter, threatening others with a carpenter's hammer and screaming profanity. The officers who responded to the scene testified that defendant refused their requests to drop the hammer and made threatening movements toward them with the hammer. When one of the officers grasped defendant in a bear hug, he struck the

officer with the hammer and also head-butted him. Defendant was eventually subdued and arrested.

Defendant gave a starkly contrasting account of the incident. He testified that, on the day in question, he borrowed a hammer from his friend, Cleo Myles, who then was his co-resident at Hessed House. Defendant explained that he wanted the hammer because he was a carpenter's apprentice and was looking for employment. Defendant testified that the Fox Valley police approached him and Myles as they sat in a park. The police questioned defendant about the hammer, and he replied that he was looking for work as a carpenter. The police left, and defendant and Myles went to Hessed House. They were standing outside the building, with defendant still carrying the hammer, when an Aurora police officer arrived. Defendant testified that he had threatened no one at Hessed House with the hammer before the officer arrived. Defendant surmised that the officer came because the Aurora police "heard my name go across the radio in the park [and] decided that it was a good time to get me because I had the hammer in my hand." Defendant testified that the Aurora police had threatened to kill him on prior occasions.

Defendant testified that, after the officer arrived, he saw a parked ambulance with police cars nearby, and he surmised that the police had summoned the ambulance because they intended to injure him. Defendant testified that the officer drew his gun on defendant without provocation. Defendant began walking away from the officer in order to evade being shot. As he walked, defendant dropped the hammer. Defendant testified that more officers then arrived in an Aurora police van. The van struck defendant as he was walking. He fell to the ground and was beaten by the officers. Defendant denied that he struck any of the officers with the hammer.

During its cross-examination of defendant, the State introduced into evidence a certified copy of defendant's September 25, 2001, conviction of aggravated fleeing or attempting to elude a police officer.

The jury returned verdicts of guilty on the charges of aggravated battery of a peace officer and resisting a peace officer. Defendant was acquitted of a third charge of aggravated battery of a peace officer (dangerous weapon). At the request of defense counsel, the trial court ordered that defendant undergo a psychological evaluation as part of the presentence investigation.

At the hearing scheduled for sentencing, defense counsel informed the trial court that defendant had refused to undergo the psychological evaluation and also refused to appear for that day's hearing. The trial court continued the proceeding.

At the next hearing, on September 20, 2004, the trial court noted that one "Doctor Brown" was present along with the assistant State's Attorney and defense counsel. The trial court asked if defendant should be "brought in" and defense counsel said, "Not just yet." There next followed an off-record discussion. When the proceeding went back on the record, defendant was present but Dr. Brown apparently was not. The trial court discussed and denied defendant's motion for a new trial. The court then proceeded to sentencing. The court noted references in the presentence investigation report (which is not in the record) to defendant's beliefs that his estranged wife's "people" are involved with the Ku Klux Klan and the Aurora police, that his father-in-law has had the Klan spray paint swastikas at his place of employment, and that each time he files for divorce or for custody of his children, the Aurora police come and beat him up. Defendant declined to make a

statement in allocution. The court sentenced defendant to four years of incarceration. There followed another off-record discussion, after which the court said:

"We're back on the record outside the presence of [defendant] who the Court has

found that his fitness to stand trial and his fitness to be sentenced is [sic] of no issue. He is fit to stand trial. He is fit to be sentenced. This issue was not raised on the record.

The Court does believe, however, from the view of the cases and from conferences,

that [defendant] does suffer [sic] a delusional disorder, persecutory complex.

It is the recommendation of this Court that the Department of Corrections house

[defendant] in the Dixon facility. And when [defendant] is evaluated prior to being housed in Joliet, that the Department of Corrections look into his mental disability of delusional disorder, persecutory."

The trial court denied defendant's motion to reconsider his sentence, and defendant filed this timely appeal.

On appeal, defendant argues that the trial court erred by not conducting a hearing on defendant's fitness to stand trial and by admitting evidence of his prior conviction of aggravated fleeing or attempting to elude a police officer. We address these arguments in turn.

The due process clause of the United States Constitution (U.S. Const., amend. XIV) prohibits the conviction and sentencing of a person who is incompetent to stand trial.

People v. Johnson, 206 Ill. 2d 348, 361 (2002).  Section 104--10 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104--10 (West 2004)) preserves this right.  Section 104--10 provides that "[a] defendant is unfit if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense."  725 ILCS 5/104--10 (West 2004).

As an initial matter, we note that defendant raised the  issue of his fitness to stand trial, if at all, only after the trial was completed.[1]  Fitness for trial is a fundamental right, and therefore the plain error doctrine permits review of fitness issues that would otherwise be waived.  People v. Sandham, 174 Ill. 2d 379, 382 (1996).  The trial court, moreover, has a duty to order a fitness hearing sua sponte whenever a bona fide doubt as to fitness arises.  Sandham, 174 Ill. 2d at 382.  The determination of whether a bona fide doubt of fitness

---

[1] The issue of fitness was first discussed by the trial court after the pronouncement of sentence.  It is not clear if defendant raised the issue or if the trial court raised it sua sponte.

exists rests within the sound discretion of the trial court.  People v. Rice, 257 Ill. App. 3d 220, 223 (1993).

Defendant's argument about fitness is twofold.  First, he argues that the judicial finding of unfitness in Meyers raised a presumption of unfitness that could be overcome only with a subsequent finding of fitness, and there was no such finding prior to trial in the present case.  In addressing this argument, we note first that the record contains no suggestion that a judicial finding of fitness was entered between our decision in Meyers and the trial in the present case.  We presume, with the parties, that defendant did not undergo a fitness hearing on remand in Meyers.  We also agree with defendant that the trial court's finding of fitness at the conclusion of the sentencing hearing in the present case was not sufficient to determine defendant's fitness at the time of trial.  See People v. Smith, 353 Ill. App. 3d 236, 243 (2004) (trial court cannot "determine retroactively whether a defendant had been fit prior to trial").

With this context in mind, we proceed to defendant's argument.  A criminal defendant is initially presumed fit to stand trial.  725 ILCS 5/104--10 (West 2004); People v. McCallister, 193 Ill. 2d 63, 110 (2000).  However, People v. Williams, 92 Ill. App. 3d 608, 612 (1980), a decision from the First District Appellate Court cited by defendant, holds that "evidence of a prior adjudication of unfitness raises a presumption that the condition of unfitness remains" and that "[t]his presumption continues until there has been a valid subsequent hearing adjudicating [the defendant] fit."

In Williams, the defendant was charged with aggravated battery.  The trial court ordered her to be examined by Dr. Reifman, a psychiatrist.  Dr. Reifman reported to the court on September 7, 1976, that the defendant suffered from a schizophrenic condition

that rendered her unfit to stand trial. On September 24, 1976, the trial court held an evidentiary hearing on fitness. On October 12, 1976, the trial court entered an order finding that the defendant was unfit to stand trial. On December 3, 1976, the trial court ordered another psychiatric evaluation. Dr. Reifman evaluated the defendant in late December 1976 and concluded that she was still unfit to stand trial. However, after a third evaluation in July 1977, Dr. Reifman found the defendant fit to stand trial. At the defendant's request, she was examined by another psychiatrist, Dr. Goldsmith, on November 3, 1978. Dr. Goldsmith diagnosed the defendant as a chronic ambulatory schizophrenic but concluded that she was nonetheless fit to stand trial. At a hearing on November 9, 1978, the trial court noted Dr. Goldsmith's conclusion that the defendant was fit to stand trial. The trial court then scheduled the matter for trial. The defendant eventually pleaded guilty on April 11, 1979. Williams, 92 Ill. App. 3d at 609-10.

On appeal, the defendant argued that the trial court's September 1976 finding that she was unfit to stand trial raised a presumption of unfitness that was never overcome with a subsequent adjudication of fitness prior to her guilty plea. The appellate court agreed, rejecting the State's contention that the trial court's reference at the November 9, 1978, hearing to Dr. Goldsmith's finding of fitness constituted an actual adjudication of fitness:

"Once there was a judicial determination that defendant was unfit to stand trial, that determination could not be overruled solely by the court's acknowledgment of psychiatric opinions that indicated otherwise." Williams, 92 Ill. App. 3d at 613.

We consider Williams of doubtful vitality because it omits some important qualifications that our supreme court in People v. Barkan, 45 Ill. 2d 261, 264 (1970), set on the presumption of unfitness:

"[T]he presumption of incompetency *** is dependent upon two conditions: the illness must be shown to be of a permanent and continuing type, and the adjudication of illness must not have been too remote."

Williams considered neither the age of the prior finding of unfitness nor whether the illness from the which the defendant suffered was of "a permanent and continuing type" (Barkan, 45 Ill. 2d at 264). Therefore, we decline to follow Williams and look instead to Barkan and its progeny.

In Barkan, the defendant filed a postconviction petition alleging that he was mentally incompetent when he entered his plea of guilty. The defendant relied on the fact that he had been adjudicated mentally ill seven years prior to the plea. The supreme court held that the adjudication was too remote in time and that the defendant had not pointed to "any abnormal behavior over the intervening seven years which might have indicated the continuance of any mental disturbance." Barkan, 45 Ill. 2d at 264.

Closer to the facts of this case is People v. Rangel, 104 Ill. App. 3d 695 (1982), a decision from the First District Appellate Court cited by the State. Rangel applied the principles stated in Barkan. The defendant in Rangel was charged with attempted burglary. He filed a petition alleging he was not fit to stand trial. By order of the trial court, the defendant was evaluated by Dr. Lorimer, a psychiatrist, who concluded that the defendant was unable to cooperate with his attorney because of " 'impulsive and threatening suicidal behavior' " and that he was at risk to harm himself or others. Rangel, 104 Ill. App. 3d at 697. On March 8, 1977, the trial court found on stipulated evidence that the defendant was unfit to stand trial and committed him to a mental health facility for treatment. In November 1977, the defendant was discharged as no longer in need of mental health treatment. Dr.

Lorimer examined the defendant again and concluded that he had become fit. The State moved for another fitness hearing, but apparently none occurred. In April 1979, following a trial at which the defendant testified in his own defense, the defendant was convicted of burglary. Rangel, 104 Ill. App. 3d at 697-98.

The defendant argued on appeal that the presumption raised by the prior finding of unfitness required the trial court to determine prior to trial whether the defendant remained unfit. The appellate court held that the presumption did not hold in light of the remoteness of the adjudication of unfitness (which occurred two years and one month prior to trial) and the lack of any indication that the defendant's unfitness was caused by a continuing or permanent condition. The court noted that Dr. Lorimer's report finding the defendant suicidal contained no clinical diagnosis and did not exclude the possibility that the defendant suffered from temporary depression brought about by his criminal charges. The court further noted that the defendant testified "lucidly and persuasively" on his own behalf at trial. Rangel, 104 Ill. App. 3d at 699. Last, the court presumed that the defendant's trial attorneys would have informed the trial court if they had doubts about the defendant's fitness. Rangel, 104 Ill. App. 3d at 699.

Based on Barkan and Rangel, we hold that defendant could not be presumed unfit for trial based solely on the finding of unfitness in Meyers. First, there is the remoteness of the prior finding. Defendant was found unfit on February 4, 2002, and was tried on July 26, 2004--an interim of two years and five months. This span exceeded by four months the span in Rangel, on which the court in that case based its conclusion that the finding of unfitness was too remote. Second, there is little suggestion in the record that the affliction diagnosed by Dr. Brown was of a continuing and permanent type. According to Dr. Brown,

defendant suffered from a " ' psychotic disorder in which his mood fluctuates rapidly.' " Meyers, 352 Ill. App. 3d at 796. Dr. Brown added that defendant was " 'angrily out of control' " and " 'suspicious, distrustful, aggressive, and most likely delusional.' " Meyers, 352 Ill. App. 3d at 796. Dr. Brown further found that defendant was irrational, lacking in judgment, and unable to understand the nature and purpose of the proceedings, and did not appreciate that the court " 'had the ability to take control of him, restrict his freedom, and try him on criminal charges.' " Meyers, 352 Ill. App. 3d at 796.

This is a meaty list of negatives, but, as Rangel instructs, we look at the actual clinical diagnosis. See Rangel, 104 Ill. App. 3d at 699. The only clinical diagnosis reached by Dr. Brown was of an unspecified " 'psychotic disorder' " that caused defendant's mood to " 'fluctuate[] rapidly' " (Meyers, 352 Ill. App. 3d at 796). Significantly, there is no suggestion that Dr. Brown believed that this psychotic disorder was permanent in defendant's case or even that disorders of this kind generally are permanent. Defendant's conduct in the proceedings below belies his claim that his disorder was still present. Absent entirely were the profane, irreverent outbursts that marked his demeanor in Meyers. Defendant, in fact, spoke only when asked and was entirely civil. His testimony at trial was coherent and lucid, albeit rather implausible. His colorful conspiracy theories about the Aurora police, the Ku Klux Klan, and his estranged wife's family may well reflect the paranoid and persecutory beliefs that were detected by Dr. Brown in Meyers and by the trial court in the present case. However, "[f]itness speaks only to a person's ability to function within the context of a trial," and "[a] defendant can be fit for trial although his or her mind may be otherwise unsound." People v. Easley, 192 Ill. 2d 307, 320 (2000). Whatever mental afflictions defendant may have suffered at the time of trial, there is no indication that they inhibited his understanding

of the proceedings or his ability to assist in his defense at trial. Defendant did, we note, initially refuse to appear for sentencing, but the reason for this is unclear, and he did ultimately appear for sentencing. We also note a reference in the record to defendant's refusal to participate in the psychological evaluation ordered by the trial court prior to sentencing. Apparently, no such evaluation took place. We cannot discern from the record what occasioned defendant's defiance. The refusal may have stemmed from circumstances entirely unconnected to any of the personality traits identified by Dr. Brown. In any event, defendant makes no attempt to show how his refusal to participate in the examination was a product of his unfitness.

In addition to the foregoing, we note that defense counsel did not raise the issue of defendant's fitness before the trial court prior to trial. The issue was first raised in an off-record discussion after sentencing, prompting a subsequent on-record finding of fitness by the trial court. We cannot tell if the issue was raised by the State, by defense counsel, or by the court sua sponte. Significantly, defense counsel made no remarks on the record regarding defendant's fitness after the issue was raised. We assume, following Rangel, that this silence meant that defense counsel had little, if any, concern about defendant's fitness.

Defendant labors exhaustively to find hints in the record that the trial court and the attorneys believed defendant was unfit during the proceedings below. First, defendant suggests that the off-record discussion that occurred at the beginning of the September 20, 2004, sentencing hearing, while defendant was outside the courtroom, concerned his fitness. Defendant bases this claim on his suppositions that the "Doctor Brown" who was present at the hearing was the same Dr. Timothy Brown who found him unfit in Meyers and

that "Doctor Brown" must not have been in court "as a casual observer." Defendant further suggests that this supposed discussion about his fitness was deliberately kept off the record and held outside his presence because the participants believed the content of the discussion may have "created doubt" about his fitness as well as "provoked disruptive outbursts [from defendant] that would hamper the smooth and efficient disposition of the case," as happened in Meyers. According to defendant, this same belief that he "was incapable of participating in the hearing without observing proper standards of decorum" also motivated the trial court to exclude defendant from the courtroom prior to making its findings on defendant's fitness.

Defendant insists that this is not "idle speculation," but we think it is. We refuse to entertain the supposition that a trial court and its officers would nefariously suppress their doubts about a defendant's fitness to stand trial and scrupulously avoid any situation that might create public evidence of his unfitness. We reject defendant's conjectures.

Defendant's second argument on fitness is that, even if the presumption of unfitness does not hold, there were independent indicia of a bona fide doubt as to his fitness. The factors relevant to a determination of whether there was a bona fide doubt of a defendant's fitness include: (1) the rationality of the defendant's behavior and demeanor at trial; (2) counsel's statements concerning the defendant's competence; and (3) any prior medical opinions on the issue of the defendant's fitness. People v. Hanson, 212 Ill. 2d 212, 223 (2004).

Although the trial court's determination of whether there is a bona fide doubt about a defendant's fitness generally is reviewed for abuse of discretion (Rice, 257 Ill. App. 3d at 223), defendant claims that the de novo standard of review is applicable here instead

because the trial court "failed to exercise its discretion." Apparently, defendant believes that the trial court could not have exercised its discretion without at least raising the issue of fitness prior to trial, even if the trial court believed there existed no <u>bona fide</u> doubt as to defendant's fitness. If defendant is correct, then a trial court must in every criminal case raise, on its own initiative, the issue of fitness. Defendant cites no authority for this novel suggestion, and we doubt any exists. As we read the relevant authorities, a trial court need raise the issue of fitness only if it finds a <u>bona fide</u> doubt as to a defendant's fitness.

Taking the <u>Hanson</u> factors in turn, we repeat much of what we said above. First, defendant behaved in a gentlemanly way during trial and his testimony was coherent and clear, albeit in many respects unbelievable. If defendant retained the unspecified psychotic disorder and negative personality traits identified in Dr. Brown's letter in <u>Meyers</u>, they do not appear to have affected his ability to understand the nature of the proceedings and to participate in his own defense. Second, defense counsel did not raise the issue of defendant's fitness at any point prior to trial, and when the issue of fitness eventually was discussed after sentencing, defense counsel made no on-record remarks on the issue of fitness. We presume, as did the court in <u>Rangel</u>, that defense counsel would have expressed on the record any concern he might have had about his client's fitness. Third, Dr. Brown's letter, though identifying many troubling aspects of defendant's personality, reached only a single clinical diagnosis: an unspecified psychotic disorder that caused mood fluctuations. Here, again, even if this disorder existed at the time of trial, there is no evidence that it may have affected defendant's fitness to stand trial.

Defendant's second argument on appeal is that the trial court erred by allowing evidence of his conviction of aggravated fleeing or attempting to elude a police officer. The

admission of a prior conviction to impeach the credibility of a witness is governed by the test established in People v. Montgomery, 47 Ill. 2d 510 (1971). For purposes of attacking credibility, evidence of a prior conviction is admissible if: (1) the crime was punishable by death or imprisonment for more than one year, or the crime involved dishonesty or false statement regardless of the punishment; (2) less than 10 years have elapsed since either the conviction or the witness's release from confinement, whichever is later; and (3) the probative value of the conviction outweighs the danger of unfair prejudice. Montgomery, 47 Ill. 2d at 516. Factor three requires a balancing test involving the nature of the prior offense, its recency and similarity to the present charge, the length of the criminal record, and the age and circumstances of the witness. People v. Sykes, 341 Ill. App. 3d 950, 976 (2003). The determination of whether a witness's prior conviction is admissible for impeachment purposes is within the discretion of the trial court. Montgomery, 47 Ill. 2d at 517-18.

Defendant's first complaint is that the trial court admitted the conviction "mechanically," without any of the requisite balancing. According to defendant, the trial court's remark that it "normally allow[s] a conviction" evinced a predisposition toward admitting prior convictions without any deliberation. Defendant further suggests that the trial court's ultimate decision to admit only one of the three convictions identified by the State was just "a practical compromise" between admitting all of the convictions and admitting none.

We said in People v. Whirl, 351 Ill. App. 3d 464, 467 (2004):

"The trial court has discretion in the balancing test and in determining whether a prior conviction is admissible. [Citation.] However, the trial court should not apply

the balancing test mechanically [citation], and the record must include some indication that the trial court was aware of its discretion to exclude a prior conviction [citation]."

In Whirl, the trial court allowed into evidence seven prior convictions, reasoning: " 'I think that's one of the things people bring to the stand. They bring their entire past to the stand.' " Whirl, 351 Ill. App. 3d at 466. We held that the trial court exercised no discretion but rather allowed the convictions on the theory "that defendant's entire history was fair game." Whirl, 351 Ill. App. 3d at 467.

Here, the trial court's discussion of the admissibility of the convictions identified by the State was brief yet did reflect deliberation. The trial court examined the probative value and prejudicial effect of the convictions, first individually, then as combined, and determined that only one of the convictions should be admitted. Our courts do not "mandate any specific format for the conduct of the balancing test." People v. Elliot, 274 Ill. App. 3d 901, 911 (1995); see also People v. Williams, 173 Ill. 2d 48, 83 (1996) (no error "when the transcript makes clear that the trial judge was applying the Montgomery standard, even though the judge did not expressly articulate it"). We conclude that the trial court did indeed exercise its discretion in determining the admissibility of defendant's prior convictions.

Defendant next argues that the trial court erred in admitting his conviction, because the crime of aggravated fleeing or attempting to elude a police officer is not a crime involving dishonesty or deceit. Defendant further contends that the crime was too similar to the crimes of which he was accused, i.e., resisting a peace officer and aggravated battery of a peace officer.

The trial court did not err.  As to the nature of the prior conviction, the crime of aggravated fleeing or attempting to elude a police officer is defined as follows:

"(a)  The offense of aggravated fleeing or attempting to elude a police officer is committed by any driver or operator of a motor vehicle who flees or attempts to elude a police officer, after being given a visual or audible signal by a police officer in the manner prescribed in subsection (a) of Section 11--204 of this Code [625 ILCS 5/11--204 (West 2000)], and such a flight or attempt to elude:

(1)  is at rate of speed at least 21 miles per hour over the legal speed limit;

(2)  causes bodily injury to any individual; or

(3)  causes damage in excess of $300 to property."  625 ILCS 5/11--204.1 (West 2000).

A defendant's "prior felony conviction may by itself evince disrespect for social order and therefore supply a proper basis for impeachment" regardless of whether the crime "involve[s] dishonesty or false statement."  Williams,  173 Ill. 2d at 83.  As a consummate exhibition of civil disruption, the crime of aggravated fleeing or attempting to elude a police officer is a proper basis for impeachment.  Moreover, though that crime has some similarity to the crimes of resisting a peace officer and aggravated battery of a peace officer, the similarity is not so great as to tip the scales against admission of the conviction.  We conclude that the trial court did not abuse its discretion in admitting evidence of defendant's prior conviction.

For the foregoing reasons, we affirm the judgment of the circuit court.

Affirmed.

BYRNE and CALLUM, JJ., concur.