2026 IL App (2d) 240753-U
No. 2-24-0753
Order filed June 17, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

ULADZIMIR MAROZAU, Defendant-Appellant.

Appeal from the Circuit Court of Lake County.
Honorable George D. Strickland, Judge, Presiding.
No. 17-CF-1511

PRESIDING JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Jorgensen concurred in the judgment.

**ORDER**

¶ 1    *Held*: On appeal from his home invasion conviction, defendant forfeited his argument that his trial counsel was ineffective for failing to raise a claim that defendant was unfit to stand trial. While defendant did preserve his argument that trial counsel was ineffective for failing to present an insanity defense, the claim was without merit because, first, counsel reasonably chose to present a different defense (*i.e.*, that defendant was authorized to enter the home) and, second, there was no prejudice because the evidence did not suggest that defendant lacked the substantial capacity to appreciate the criminality of his conduct. Finally, the trial court did not err in denying defendant's motion for a retrospective fitness hearing, as there was no indication that defendant could not understand the nature of the proceedings or participate in his defense.

¶ 2    Following a bench trial, defendant, Uladzimir Marozau, was found guilty of three counts of home invasion (720 ILCS 5/19-6(a)(2) (West 2014)) and one count of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2014)). The charges stemmed from an incident

that occurred in the early morning hours of May 29, 2017. Defendant entered his friend's residence, attacked his friend's wife, and dragged her from the residence. At the time of the incident, the friend and the victim were in the process of divorce and the friend was not living at the residence, which he owned. Defendant testified at trial that his friend had given him a key to the residence and permission to enter. Defendant also claimed that the victim was a terrorist. On appeal, defendant contends that (1) trial counsel was ineffective for failing to investigate defendant's mental health for purposes of pursuing an insanity defense and (2) the trial court erred in denying defendant's motion for a retrospective fitness hearing. We affirm.

¶ 3                                I. BACKGROUND

¶ 4                          A. Charges and Bench Trial

¶ 5    On June 28, 2017, defendant was indicted on three counts of home invasion (720 ILCS 5/12-11(a)(2) (West 2014))[1] (counts I-III), one count of residential burglary (*id.* § 19-3(a)) (count IV), and one count of unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2014)) (count V). On December 12, 2018, two counts were added: aggravated kidnapping (720 ILCS 5/10-2(a)(3) (West 2014)) (count VI) and kidnapping (*id.* § 10-1(a)(2)) (count VII). The matter proceeded to a bench trial at which defendant was represented by Vadim Glozman, Douglas Zeit, and Joseph Zeit (collectively, trial counsel).

¶ 6    Defendant's bench trial took place over several days: February 1, 2019, February 20, 2019, April 1, 2019, and May 21, 2019. The record does not contain a report of the February 20, 2019,

---

[1]In 2013, the home invasion statute was renumbered from section 12-11 of the Criminal Code of 2012 (720 ILCS 5/12-11 (West 2010)) to section 19-6 (720 ILCS 5/19-6 (West 2014)). See Pub. Act 97-1108, § 10-5 (eff. Jan. 1, 2013) (renumbering as 720 ILCS 5/19-6). Although the offenses here occurred in May 2017, the indictment and judgment order erroneously cites to section 12-11(a)(2).

trial proceedings.[2] The following relevant evidence was derived from the provided trial transcripts.[3]

¶ 7     The victim, 33-year-old N.L., testified that she moved to the United States from Moscow in 2013 and married Dmitry Levites. They lived in a townhouse in Highland Park, which was owned by Dmitry (the residence). Their daughter, S.L., was born in October 2014. On April 20, 2017, N.L. obtained an order of protection against Dmitry, which prohibited Dmitry from having any contact with N.L. and S.L. On that same date, Dmitry moved out of the residence and went to

---

[2]According to the State, "[t]he missing transcripts appear to include evidence regarding defendant's arrest and *** subsequent recovery of cocaine in his possession."

[3]The State contends that defendant's statement of facts violates Illinois Supreme Court Rule 341(h)(6) (eff. Oct. 1, 2020), which requires that the appellant's brief "shall contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." We agree. Although defendant's statement of facts contains portions of his own trial testimony, defendant has failed to include any testimony of the numerous witnesses who testified on behalf of the State. Defendant suggests in a footnote that these facts are not pertinent because the appeal is centered on the performance of trial counsel and the events post-trial. We note, however, that the evidence supporting defendant's convictions is relevant to defendant's ineffective-assistance-of-counsel claim, in particular, as to whether defendant was prejudiced by counsel's alleged deficient performance. See *People v. Torres*, 2024 IL 129289, ¶ 27 (to prevail on a claim of ineffective assistance of counsel, the defendant must establish both deficient performance and "that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different"). " 'The rules of procedure concerning appellate briefs are rules and not mere suggestions.' " *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7 (quoting *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999)). We caution counsel to comply in the future with the rules of our supreme court.

live with defendant, his friend. On April 25, 2017, Dmitry initiated divorce proceedings against N.L.

¶ 8    N.L. testified that, on May 23, 2017, an order was entered in the divorce proceedings between her and Dmitry. (The order was entered into evidence as People's exhibit No. 17.) The order provided, among other things, that N.L. was to have exclusive possession of the house for four weeks. The order allowed Dmitry to enter the residence and pick up his belongings at a time agreed upon by the parties, but no later than four days after May 23, 2017. The order also provided that each party may have a witness present. (N.L. testified that the order provided for two witnesses, but it appears to provide for "a" witness.) According to N.L., Dmitry went to the house on May 23, 2017, to retrieve his belongings while she was at work. When N.L. returned home, she saw that the residence had been "emptied out" except for the heavy furniture. She called the police, who told her that Dmitry went to the residence accompanied by a friend. On May 24, 2017, N.L. changed the locks on the house.

¶ 9    N.L. testified that, on May 29, 2017, at around 5 a.m., she awoke to the sound of her front door slamming and footsteps "running on the staircase." Defendant rushed into N.L.'s bedroom, pushed her against the closet, and grabbed her by the hair. Defendant then began "hitting [her] head against the wall." N.L. began yelling as loudly as she could so her neighbors would hear her. This continued for five to ten minutes. Next, defendant dragged N.L. down the stairs and slammed her head against the steps and railings numerous times. Defendant then dragged N.L. outside. N.L. saw her neighbor—Barbara—and yelled for her to "help save [S.L.]" Defendant was shouting "Dima, Dima" and began to push N.L. toward a red car that was approaching. Defendant shoved her against the car as the passenger door was opened from the inside. The driver—later identified as Dimitry Voronin—stepped outside, but N.L. did not recognize him. She did not know if anyone

else was in the car. Howard Dane, a neighbor, tried to help N.L. Several other neighbors called the police and were yelling at defendant to stop. Defendant was "screaming to Dima 'go get the kid.' " Voronin "started screaming, 'let's go, let's go, police is coming.' " Defendant continued to beat N.L. until the police came and surrounded him. N.L. was transported to a hospital where she was treated for her injuries.

¶ 10    Howard Dane lived with Barbara Baratz next door to the residence. Dane testified that, on May 29, 2017, at around 5:30 a.m., he heard a noise outside. When he looked out his bedroom window, he saw defendant on N.L.'s patio trying to open her sliding glass doors. Baratz called the police. When Dane went outside, he saw defendant "dragging [N.L.], actually pulling her down the sidewalk by her hair" toward the street where a car was located. As defendant was dragging N.L., defendant yelled multiple times to a person who was standing by the car to "go in and grab the baby." N.L. "was yelling and screaming to stop." The front door of her house was open, and Dane saw N.L.'s daughter crying and yelling for N.L. Dane then tried to pull N.L. away from defendant. Next, the police arrived and pulled defendant off N.L.

¶ 11    Baratz testified that when Dane told her that there was someone outside, she immediately called the police. A few minutes later, while still on the phone with 911, Baratz ran outside and saw defendant dragging N.L. out the front door. Defendant was pulling N.L.'s hair, and N.L. was screaming. N.L. tried to grab hold of Dane, who was trying to help her. Baratz saw a man standing outside a car parked across from her townhouse. Defendant was telling the man to "to go get the baby" and "was having a difficult time *** getting [N.L.] into the car." Defendant was banging N.L.'s head on the concrete ground when the police arrived.

¶ 12    Dmitry Levites testified that, in May 2017, N.L., his then-wife, obtained an order of protection against him, and he was required to leave the residence. After leaving the residence,

Dmitry stayed with defendant at his apartment in Palatine. Dmitry had been friends with defendant for about 13 years. Dmitry described his divorce as "a problem divorce" that involved several "domestic problems." During the divorce proceedings, Dmitry "was a little bit confused," and defendant said, " '[D]on't worry, I'll help you, we'll figure that out.' " Defendant went with Dmitry to meet with Dmitry's divorce attorney. Defendant "definitely was aware of everything that was happening" with Dmitry's divorce case and was getting the same e-mails from the attorney as Dmitry.

¶ 13    Dmitry testified that a court order allowed him to go back to the residence with two witnesses to get his belongings; it also dismissed the order of protection. Dmitry and defendant reviewed the order together. Dmitry went to the residence twice. Dmitry testified that, before going to the residence to retrieve his belongings, he went to the Highland Park Police Department to inform them that he would be doing so. According to Dmitry, they told him to "just go." When he went back a second time, N.L. had changed the locks. Defendant called a locksmith. The locksmith changed the locks. Dmitry and defendant were present at the time. Dmitry did not recall how many keys the locksmith made: "One or two. I don't remember." The locksmith gave defendant a key. Asked if he told defendant to "give [him] the key," Dmitry replied, "I think I added my key on my key chain afterwards." When asked whether he gave defendant "the key," he stated: "No. Eventually I gave the key to him because he was very active. But eventually I got the key on my key chain." Dmitry testified that he never told defendant that "all the court orders were gone and that [Dmitry] could get back into the residence." Dmitry never gave defendant permission to enter the residence without him.

¶ 14    Dmitry testified that, on May 28, 2017, defendant was "very drunk" and told Dmitry he had to leave defendant's apartment. Dmitry left. He later learned that defendant had been arrested.

¶ 15    Palatine police officer Dustin Rusch testified that, on May 28, 2017, he went to defendant's residence in response to a call from defendant asking that Dmitry be removed from defendant's apartment. Dmitry left without incident.

¶ 16    Highland Park police detective Brian Soldano testified that he and Highland Park patrol sergeant Michael Flaig interviewed defendant on May 29, 2017. The interview was video recorded. The video recording was admitted as People's exhibit No. 16 and played for the trial court. As the video was played, Soldano periodically answered questions about the interview. During the interview, defendant discussed Dmitry's divorce case. Defendant stated that Dmitry gave his divorce attorney permission to e-mail defendant. Defendant stated that he was managing Dmitry's divorce "through e-mail" and "basically doing everything except for going in for the actual court appearance." Defendant stated that Dmitry was living with defendant because "there was an order of protection" and Dmitry could not go to the house. Defendant claimed that, "on Friday, Dmitry *** said that the order of protection had been removed and that now they can go to the house and take everything." Defendant claimed that he told Dmitry not to "turn [S.L.] over to [N.L.]" because N.L. did not care about S.L. and S.L. would not be safe.

¶ 17    According to Soldano, defendant claimed that when he and Dmitry went to the residence to retrieve items and the key did not work, Dmitry told him "to just break the door, kick it in." Defendant claimed that he told Dmitry, "[W]hy don't we do this legally, you have—you're allowed to be here per a court order, you talked to your attorney, you're allowed to be here. Let's call a locksmith to open the door." Defendant said that "he received a key from the locksmith." Defendant said that he had a receipt from the locksmith, but he hid it. Later in the interview, defendant stated that he told Dmitry that "he doesn't want to do anything illegal[.]" He said, "[I]f you can't go to the house, don't go to the house."

¶ 18    Defendant described for Soldano the incident that took place on the morning of May 29, 2017. Defendant stated that Voronin drove him to the residence. Defendant told Voronin to park his car "down the road a ways so the neighbors don't see him." Defendant also talked to Soldano about "electronic devices that [defendant] had in his possession that he could take all the information off N.L.'s hard drive and put on to these electronic devices." Defendant stated that he had hidden a black backpack in the neighbor's yard and that he really needed the backpack back. Defendant claimed that when he reached the house, he intended to stand on a grill and enter through a balcony, but the grill was no longer there. Defendant then stated that he used a key to enter the residence. Defendant stated that he was never able to get N.L. in the car. Defendant claimed that he was trying to get N.L. to the police department and that Voronin was going to help him get her there in his car.

¶ 19    According to Soldano, defendant repeatedly stated during the interview that he wanted to follow the law and did not want to do anything illegal. Defendant told Dmitry that they should follow every court order. Defendant also admitted that he hid his phone so he could not be tracked and instead used Voronin's phone. He also admitted that he had Voronin hide the car so that the neighbors would not see it.

¶ 20    On cross-examination, Soldano agreed that defendant told him that he used a key to enter the residence and that there were no signs of forced entry into the residence. He also agreed that when he interviewed N.L., she told him that she heard defendant say, " '[G]et the laptop.' " He also agreed that no court orders were found in the backpack retrieved from the scene.

¶ 21    Flaig testified that, on May 29, 2017, after his and Soldano's interview with defendant, he spoke with defendant to determine whether Dmitry was aware of what defendant had done that day. Defendant said that Dmitry was unaware. They also discussed the backpack defendant had

left on the neighbor's patio before entering the house. After learning where defendant had left the backpack, Flaig recovered it from the scene. According to Flaig, the backpack contained "[a] lot of stuff: computers, hard drives, drugs."

¶ 22    Gina Romano, a forensic scientist with the Northeastern Illinois Regional Crime Laboratory, testified that People's exhibit Nos. 18 and 30 consisted of a "plastic bag containing [a] white chunky powder" and a "tin." Romano determined that the white chunky powder weighed 0.44 grams and contained cocaine.

¶ 23    (The record contains a portion of testimony from police officer Andrew Cumba, which apparently was continued from February 20, 2017. He confirmed that Dmitry had e-mailed him People's exhibit No. 17 (the May 23, 2017, order entered in the divorce proceedings)).

¶ 24    At the close of the State's evidence, defendant moved for a directed finding, which the trial court denied.

¶ 25    Randy Kepley, a locksmith, testified that he was dispatched to the residence on May 26, 2017, and encountered two men. Dmitry provided Kepley with his driver's license and told him that he was locked out of his house. The address on the driver's license matched the address of the dispatch. Kepley made a key that fit both the deadbolt and the doorknob. Kepley gave Dmitry "one or two keys," and Dmitry paid him. Kepley only spoke with Dmitry. He usually issued two keys, but he did not make a particular note of it on the invoice. He did not see what Dmitry did with the keys.

¶ 26    Defendant testified that he was 35 years old. He was born in Belarus and immigrated to the United States in 2004. He met Dmitry in 2005. They had a close relationship—like "family." As of January 2017, they talked "basically every day." Defendant knew N.L. and S.L. Defendant would visit Dmitry at the residence two to three times per week. Defendant described Dmitry and

N.L.'s relationship as "[c]omplicated." Dmitry separated from N.L. at the end of April 2017 and moved in with defendant. At that point, defendant spoke with Dmitry "at least ten times a day." They ate all their meals together and planned to move into Trump Tower. They signed a lease and planned to move in on May 29, 2017.

¶ 27 Defendant testified that Dmitry asked him to help with his divorce. He asked defendant to help him find an attorney and scan documents. Defendant never went to court with Dmitry and did not know what was actually said in court; he only knew what Dmitry told him. Defendant never saw any court orders.

¶ 28 According to defendant, beginning in January 2017, Dmitry began to talk about the possibility that N.L. was a terrorist. Dmitry told defendant "[t]hat [N.L.] was born in Dagestan and that the guys from Dagestan were behind the explosion at [the] Boston Marathon." Dmitry also told him that N.L.'s older sister's brother-in-law "spent five years in prison because of his terroristic activities." Defendant had no reason to doubt Dmitry. Dmitry spoke about the possibility of N.L. being a terrorist "[h]undreds of times."

¶ 29 On May 26, 2017, defendant went to the residence with Dmitry and another individual "to pick up the wheels for the car and other expensive belongings." Dmitry told him "that there were no active orders of protection at the time." Defendant asked Dmitry to go to the police station before entering the house "so everything would be for sure according to the law." Dmitry told defendant he went to the police station. When they arrived at the residence, they were not able to get in because the locks had been changed. Defendant had no reason to think that Dmitry was not allowed inside. Dmitry asked defendant to "knock off the door," but defendant refused to do so. Defendant told Dmitry, "Let's follow the law and obey the law and call the locksmith." They called a locksmith, who arrived within 20 to 30 minutes. Dmitry showed his identification and paid the

locksmith. Defendant identified a receipt dated May 26, 2017, from the locksmith. Defendant testified that the locksmith made "[o]ne, two" keys and gave them to Dmitry "[b]ecause it's Dmitry's house." Dmitry then gave defendant a key "[r]ight there on the spot." Dmitry told defendant to keep the key. According to defendant, Dmitry said, "You should have the key in case you ever want to use it." Defendant believed that Dmitry had the authority to allow him to use the key to enter the residence and that he could use the key whenever he wanted. He stated, "Dmitry is my friend. The house belongs to Dmitry. Dmitry gave me the key. I had no reason not to believe Dmitry and his offer." Defendant was unaware of any court orders forbidding Dmitry from entering the house.

¶ 30    Defendant testified that, on the evening of May 28, 2017, he asked Dmitry to leave his house and called 911, "[b]ecause Dmitry's story and extent to the story and [N.L.] belonging to the terrorist organization was above any normal behavior."

¶ 31    Defendant testified that, on May 29, 2017, he went to the residence to determine "whether or not it [the terrorist activity] was going on." Defendant identified a 911 recording wherein he asked the dispatcher to send help to the residence. Defendant wanted the police to come to the residence because "[he] needed their help."

¶ 32    On cross-examination, defendant testified that Dmitry never told him to go to the residence on May 29, 2017. Defendant claimed that he walked in through the front door. He claimed that he did not bring his phone because he did not want to be traced by the "organization"; "[i]t had nothing to do with the police." He asked Voronin if he could borrow his car because he did not want to be identified. Voronin offered to drive him instead. Defendant could not remember if the locksmith made one or two keys; he only remembered that the locksmith gave the key or keys to Dmitry. Defendant claimed that he went to the residence "to have a conversation." When N.L. started

screaming, defendant "started to panic." Defendant agreed that N.L made the 911 call played in court. He stated, "And when she was on the phone, I was certain that she was calling Dagestan. So I took the telephone, and I told them, 'This is the address; it's great; see you soon.' "

¶ 33    Defendant agreed that he spoke with the Highland Park police before May 29, 2017, and told them that he was going to kidnap S.L. Defendant explained that he did so because he wanted the police "to pay attention to what was going on." Defendant stated: "No one wanted to kidnap anyone." Defendant stated that he never told Voronin "to go inside and get [S.L.]"; defendant went there "to collect the evidence of how it was."

¶ 34    On redirect examination, defendant testified that he went to the residence on May 29, 2017, to find proof of N.L.'s "association with the organization." He was only planning on talking to her. When she started to scream, he panicked because of all the things Dmitry had told him about her.

¶ 35    The trial court found defendant guilty of three counts of home invasion and one count of unlawful possession of a controlled substance. The court found defendant not guilty of residential burglary, aggravated kidnapping, and kidnapping. The court found that N.L. and the neighbors were credible, whereas defendant was not. The court found that defendant's statement to the police and his trial testimony did not make sense. The court stated:

> "First of all, I'm asked to believe that [defendant] didn't understand what was going on here. That's not true. Every bit of other evidence shows that he was inordinately involved in this divorce, that he was consulting and looking at documents, that he constantly was talking with [Dmitry], who had an order of protection against him in this case which forbade him from coming into the house, that he was present for conversations with the police with [Dmitry], that he had a conversation with the police regarding—when he threatened to kidnap the child the day before, that he specifically stated that he had a

- 12 -

court order with him and that he read and memorized it. Now I'm being asked to believe that none of that's true, and I simply don't believe any of that."

The court rejected the argument that defendant had any authority to enter the house and take physical custody of N.L. The court did not believe that Dmitry ever told defendant that he could enter the residence whenever he wanted. The court found that defendant's actions—for instance, going to the backyard—showed that he knew that he did not have consent. The court stated: "Every single factor militates against there being any form of consent, any form of mistake of fact." The court also rejected defendant's claim that he went to the house to investigate terrorists, stating:

"And I don't believe he was investigating terrorists. I don't think I have to belabor what I consider to be a fanciful point with that. He wasn't there to do that. He was there to take custody of [N.L.] That was his intention from the very beginning. Everything he did was with an eye towards that. That was his intention."

¶ 36                                      B. Motions for New Trial

¶ 37    On June 20, 2019, defendant filed a motion to reconsider the finding of guilt or, alternatively, order a new trial. Defendant argued that the State failed to prove him guilty beyond a reasonable doubt of home invasion and unlawful possession of a controlled substance. Defendant also argued that the trial court erred in admitting certain evidence.

¶ 38    On December 16, 2019, defendant moved to continue the sentencing hearing. Defendant advised the trial court that he had recently retained new counsel—Jed Stone—and wished to discharge current counsel. On December 19, 2019, the court granted Stone leave to appear and prior counsel leave to withdraw. The matter was continued.

¶ 39     On April 20, 2020, defendant—via Stone—filed a supplemental motion for a new trial, contending that trial counsel was ineffective for failing to investigate and present an insanity defense. The motion alleged, among other things:

> "[Defendant] told the police, immediately after the alleged crime, that he entered the home believing that [Dmitry] wanted him to recover a laptop computer that contained evidence of [N.L.'s] *** involvement in Islamic terrorism. He believed that he was compelled to enter the house, take the computer and [N.L.] to the Highland Park police and expose this terrorist cell in order to protect the child, [S.L.], and save the nation for [*sic*] a terrorist attack. He was so convinced of his 'mission' that he even called the police on a 911 call for help in executing his plan and saving the nation from disaster."

According to the motion, there is "credible evidence that [defendant] lacked substantial capacity to appreciate the criminality of his conduct." Defendant argued that "[t]hese issues are for a trier of fact to resolve." Defendant "demand[ed] a new trial before a jury to present the evidence of insanity."

¶ 40     Defendant attached as exhibits (1) a report of defendant's statements during a police interview, (2) defendant's affidavit, (3) a report including police observations of defendant on the day of the event and in previous encounters, and (4) a preliminary letter from Dr. Kara Anast, a clinical psychologist retained by Stone to evaluate defendant, noting "potential paranoid ideations and delusions."

¶ 41     On July 15, 2021, the trial court held a hearing on defendant's initial and supplemental motions for a new trial. The court heard testimony from Dr. Anast, Dr. Robert Hanlon, Douglas Zeit, and defendant. The following relevant testimony was presented.

¶ 42   Defendant called Dr. Anast, a licensed clinical psychologist and an expert in the field of clinical psychology. She testified that she evaluated defendant in 2020. In addition to interviewing him and administering two psychological tests, she also reviewed the trial transcripts, police reports, bank statements, and letters from defendant's family members and friends. Dr. Anast diagnosed defendant with "a provisional delusional disorder of the persecutory type." She explained that "provisional" meant that it is not clear whether his beliefs—*i.e.*, that "people are out to get him" and that "his friend's wife was a terrorist"—are delusions or possibly the truth. Dr. Anast did not consider any "cocaine information" in making her diagnosis because she did not "have any evidence to suggest that [defendant] had actually taken the cocaine." When asked whether, in her opinion, defendant suffered from a disease or defect of the mind such that he lacked substantial capacity to appreciate the criminality of his conduct, she opined: "I do believe that his delusional and paranoid-type thinking, so his delusional disorder, played a significant role in his ability to make decisions that potentially led to his criminal behavior."

¶ 43   The State called Dr. Hanlon, an expert in psychology and licensed clinical neuropsychology. He testified that he conducted a forensic psychological evaluation of defendant on March 24, 2021. Dr. Hanlon diagnosed defendant as having "other specified personality disorder, mixed personality disorder with narcissistic, turbulent, compulsive, histrionic and paranoid features." Dr. Hanlon agreed that there are people "who act bizarrely, oddly, but do not suffer [from] a mental disease as one would consider when evaluating an individual for the defense of insanity." The following colloquy occurred:

"[STELLA DAY (ASSISTANT STATE'S ATTORNEY)]. Now based on your evaluation again, did you render an opinion to a reasonable degree of psychological and

scientific certainty as to whether the defendant lacked the substantial capacity to appreciate the criminality of his conduct?

A. Yes.

Q. And what was your opinion?

A. It was my opinion that [defendant] did not lack a substantial capacity to appreciate the criminality of his conduct as a result of a mental disease or mental defect such as my opinion that he was not insane.

Q. And what is the basis of that portion of the opinion, the criminality portion? We talked about mental defect, but can you explain what it means to not lack a substantial capacity to appreciate the criminality of your conduct?

A. Based on the information, based on his description that he provided to me—and I evaluated many people for assessment of insanity, and I've opined five times in my career that people clearly did not appreciate the criminality of their behavior at the time of their crime. And they exclude—those individuals exclusively manifested severe mental illness. And in [defendant's] description, he even questioned whether, you know, maybe—I question whether it was legal or not. I thought I had permission. Those kind—that kind of explanation, I think, doesn't even come close to meeting the legal criteria for insanity."

¶ 44    The State also called Douglas Zeit, who testified that he had previously represented defendant in 2013 on a charge of possession of a controlled substance. Zeit spoke with defendant from time to time, and defendant had referred other people to Zeit. Defendant had originally reached out to Zeit in 2017 to represent him in the present case. However, Zeit learned that defendant was being represented by someone else and that Zeit was no longer needed. Zeit was

not contacted again until 2018. He eventually filed an appearance in this case. Zeit testified as follows regarding his numerous discussions of trial strategy with co-counsel and defendant:

"[STELLA DAY (ASSISTANT STATE'S ATTORNEY)]. Now prior to the trial, did you discuss with the defendant trial strategy, how you wanted to approach the case?

A. We all did. And quite frankly, we would—we met on numerous occasions, both in—excuse me—my office as well as [Glozman's] office downtown relative to the case and almost invariably [defendant] was there.

Q. During those discussions, would it be fair to say that there were numerous or more than one strategy discussed and its merits?

A. All the time."

They advanced a defense that defendant was lawfully permitted to be at the house and, thus, could not be found guilty of home invasion. Zeit believed then—and still believed—that it was a valid defense. Zeit explained that he and co-counsel never believed that insanity was a viable defense:

"Q. Now prior to that trial strategy, had anyone floated the defendant or one of you, one of his attorneys, the idea of the insanity defense?

A. No. We never had an issue with regards to insanity, although a couple of times we thought was there a fitness issue because [defendant] is quite a character. And we discussed with him, amongst ourselves, whether in fact there was a fitness issue, and particularly in light of this terrorist activity of the victim in this matter. And we came to the conclusion—when I say we, it was really a collective conclusion that because he was such good friends, or at least was at that point, with Dmitry ***, that that was to try and gain some leverage because of the divorce.

If memory serves me, when Dmitry and his wife separated[,] Dmitry went to live with [defendant] and was there for quite some time before this event occurred.

* * *

Q. Okay. Then from 2017 to the start of the trial, did you believe that [defendant] was insane?

A. I didn't see him in 2017. The first time I saw him relative to this [case] was in 2018 when I filed an appearance. And so I would have seen him sometime during that time period. And I believe it was the summertime. I believe I filed an appearance in July of 2018.

Q. And at that point?

A. I did not believe there was any fitness issue whatsoever.

Q. What about insanity?

A. Didn't strike me that he was insane.

Q. What about that as a trial strategy? Was that discussed as a trial strategy, insanity?

A. Yeah. We talked about a lot of various issues that we thought were trial strategies, and none of us, when we talked about it and batted it around, thought that insanity was a real, live issue under the circumstances.

Q. And the defendant was involved in those discussions?

A. On several occasions, yes, he was.

Q. And when you finally went with the defense that you did go with, that was with the approval of the defendant?

A. Yeah. We talked about it a lot. ***.

[W]e thought given the circumstances, that was the appropriate defense. ***.

Q. Now during your discussions with him regarding various defenses, he had told you that he did truly believe that he had—or concurred with the idea that he had the authority to be there as your defense concluded?

A. Yes.

Q. And with him involved as well that that was going to be the defense that you guys were going to go with, he was in full agreement?

A. I believe that's correct. And one of the things that kind of surprised us at the trial was that, I or somebody had—perhaps maybe one of our investigators had talked to the locksmith who had to open the door for Dmitry. And it was our impression that the key was given from the locksmith when he opened it up to Dmitry who then gave us the key who gave [defendant] the key.

Well, when Dmitry testified—and again it was a little bit of a surprise to us—he said no. The key came directly from the locksmith to [defendant].

Q. The defendant testified too?

A. I believe he did, yes.

Q. And he said that Dmitry gave him the keys?

A. Yes. He testified to that, yes.

Q. Did the locksmith also testify that he—did he say he couldn't recall who he gave the key to?

A. I don't remember. I believe the locksmith said he gave it to—

Q. The owner?

A. —the owner, yes.

Q. Which was again—

A. Dmitry.

Q. —consistent with your defense theory?

A. Correct."

¶ 45     Zeit was questioned on cross-examination regarding the defense pursued at trial. Zeit stated that the chosen defense was that no home invasion occurred because there was no unlawful entry. Zeit knew that Dmitry was living with defendant, but Zeit believed that Dmitry was not forbidden from entering the residence. Zeit also believed that Dmitry had given defendant the key. Zeit knew that defendant had told the Highland Park police that he had obtained the key directly from the locksmith, but Zeit stated that defendant told trial counsel that he had obtained the key from Dmitry; Zeit "knew that that was an issue." Zeit stated further that, although Dmitry denied at trial that he gave the key to defendant, "up until that point, [Dmitry] had not." Zeit stated, "So it came as somewhat of a surprise to us." Zeit testified that he read the police reports "many times." When questioned as to whether trial counsel ever investigated an insanity defense, Zeit stated: "We did not. We didn't think that was in play as we talked about the case for the year, year and a half that we were with [defendant] ***."

¶ 46     The State also introduced a jail recording of a telephone conversation between defendant and Joseph Zeit during which defendant indicated his satisfaction with trial counsel. The court listened to the recording and admitted it into evidence.

¶ 47     Following the State's evidence, defendant was called in rebuttal and testified in relevant part as follows. When defendant was first released from jail, Glozman came to his house. Defendant told him "the whole story" about how the "terrorist organization" tried to kill him. Glozman told defendant to "shut up and never repeat this and never tell anybody about this because

it sounds stupid, and you look insane." Glozman told him, "We will do our defense about the key and that's it." Defendant could not remember what he told the police about the key. He did recall the following about the transaction with the locksmith: "When locksmith—when locksmith came, he had the key. He was with me in front of the door. He gave it to Dmitry to give it to me. It was quick." He reiterated that Dmitry had given him the key and said, "[I]t's better you will keep it." When defendant brought up terrorism, the attorneys "laughed at [him]" and told him to "[j]ust forget about it." Defendant spoke with Glozman once or twice a week for two years. Glozman told defendant just to do what Glozman told him to do or Glozman would not represent him.

¶ 48    At the close of evidence, the matter was continued for additional argument to August 12, 2021. On August 5, 2021, Stone filed a "Memorandum of Law in Support of his Motion and Supplemental Motion for New Trial."

¶ 49    On August 12, 2021, following argument, the trial court found that defendant was not denied the effective assistance of counsel and thus denied defendant's motion for a new trial. The court found that defendant was not a reliable witness and, therefore, gave little weight to his testimony and statements. The court found both Dr. Anast and Dr. Hanlon "to be credible witnesses in that [the court] believe[d] that they were accurately portraying what their observations were based on the data." However, the court found Dr. Hanlon to be "far more qualified than Dr. Anast." The court noted that Dr. Anast's experience was "infinitesimal" as compared to Dr. Hanlon's. The court had "a huge problem" with Dr. Anast's "disregard of the substance abuse issue here" even though she was aware that defendant had "been charged multiple times with DUI and a prior drug case," had "been ordered into drug counseling in the past," and was convicted in the present case of possessing cocaine. The court believed that defendant was under the influence of cocaine at the time of the offense (and cited facts related to his behavior at the time of arrest) and noted that Dr.

Anast "admitted that [her] conclusions were not going to be accurate if there was substance abuse present."

¶ 50    The trial court agreed with both doctors' conclusion that defendant was "narcicisstic [*sic*]" and that "[n]arcissim [*sic*] was a huge factor here." The court noted that much of defendant's posttrial motion focused on defendant's statements that N.L. was a terrorist. The court continued:

"What I didn't hear a lot about in the posttrial motion, but I did hear a lot about during the trial, was the context of what Mr.—the defendant and [Dmitry] were doing with each other. This case is all about that context. There's no question about that. And it fits perfectly into [defendant's] narcicisstic [*sic*] personality [disorder].

And by the way, I also find that he has a relatively serious substance abuse problem based on the past and based on this case.

So, what [defendant] was doing was inserting himself into this divorce; this very bitter divorce where there was a child custody argument. [Dmitry] had been kicked out of the house. There was an order of protection at one point; although, that had expired. And there was [*sic*] arguments over property, contested litigation over taking of property.

And [defendant], for whatever reason, decided that he was going to get involved in this."

¶ 51    The trial court rejected the notion that defendant was unable to appreciate the wrongfulness of his behavior:

"If he wanted the police involved, he knew how to do that. He had no intention of the police being involved in this case, and that is clear.

This was a premeditated act.

The night bef—besides, that night, him getting—not bringing his cell phone with him, which, of course, could have been used to track him.

And not using his car, which could have been used to identify him. He got a third party to do the driving and to use their car which would have enabled a quick get away.

He also instructed that person to park in an area where he was less seen so the neighbors and/or the victim wouldn't see him.

He did attempt—and this is another—something he lied about; he did attempt to get in through the back door. He was observed by a neighbor trying to get in the back door. The bag was back there with a computer in it. He tried to go in the back door; not the front door; the back door. That is obvious planning, and it's is [*sic*] obvious that he was attempting to surprise her.

In addition to that, this was at a time of the day, or early morning, where very few people would be up; and very likely that she would be sleeping.

In essence, everything about the entry into the home was done to avoid detection; and that includes by the police.

* * *

In essence, I believe that he was attempting to bully the ex-wife in this case. Potentially that would have been successful, and he would have been a hero in his friend's eyes.

And, so, I do find that there was not just evidence, not suggestions, not reasonable inferences; there is conclusive evidence in this case that [defendant] understood that what he was doing was wrong."

¶ 52    In addition to finding failure to establish prejudice, the trial court also noted that trial counsel's chosen trial strategy—that Dmitry consented to defendant's entry and that defendant reasonably relied on Dmitry's consent—although rejected by the court, was not objectively unreasonable. The court stated: "[W]hile it was not successful, it is—it was a matter of trial strategy. And I cannot find that their attempt at that trial strategy; albeit, an unsuccessful attempt; was a deficient performance."

¶ 53    Accordingly, the trial court found that defendant was not denied the effective assistance of trial counsel. The court denied defendant's motion.

¶ 54                    C. Posttrial Motion to Declare Defendant Unfit for Sentencing

¶ 55    Just over one month later, on September 17, 2021, Stone filed a "Motion to Supplement the Record and Declare the Defendant Unfit to be Sentenced." The motion alleged that, following the hearing on defendant's motion for a new trial, Stone received a call from Special Agent J. Coleman of the Federal Bureau of Investigation (FBI). Coleman advised that defendant "had mailed a number of letters to federal agencies and prosecutors in which [defendant] claimed to possess information about terrorist activities in the United States." Stone attached various letters to the motion. Stone argued that it was clear that defendant was unfit to be sentenced and asked the trial court to find a *bona fide* doubt.

¶ 56    A hearing on the motion took place on September 20, 2021. Stone advised the trial court that defendant's letters referred to "a conspiracy between [the assistant state's attorney] and [the] [c]ourt to block evidence of a terrorism conspiracy." Defendant also wrote that Stone—lacked the " 'power' " to present evidence about terrorism to the court. Stone indicated that he had no doubt that "[defendant] suffers from a mental illness" and asked the court to order an evaluation to determine whether defendant was fit to be sentenced. After hearing argument, the court stated:

"All right. Well, um, this is an extension of what I have heard repeatedly throughout this case and I will take this at face value only. It is believed that she is a terrorist. I assume she's not a terrorist. I never heard any evidence that she's a terrorist or not. There's no evidence in the record so I am going to assume that she's not.

Regarding this belief, it's the same belief that I have already indicated I have doubts about in some detail. I pointed out numerous parts of the trial I felt real impetus behind these acts that took place were divorce and not anything to do with terrorism bases [*sic*] on statements made by [defendant] among other people, and so I don't know that I consider this to be that much of a change.

Now when I read the letters I do see I guess somewhat more of a standing I guess you can kind of say paranoid view of what's going here. Not that I haven't read letters like this many times in the past, I couldn't count how many times defendants accused judges and lawyers of conspiring against them, that doesn't in and of itself means he is unfit either.

Let me start by asking you, Mr. Stone, I assume you have been dealing with him somewhat preparing for sentencing or not. I don't know. Has he cooperated with you other than this issue about her being a terrorist? Has he been able to cooperate with you and in preparing to be sentenced?"

Stone replied:

"He is all over the place. He speaks with a rapidity voice, is unable to focus is in my judgment as a lawyer not as psychologist detached from reality.

Had he not written to the FBI and had the FBI agent not come to my office[,] I don't think I would be here asking for a fitness evaluation. For whatever it's worth[,] the FBI agency said he's detached from reality and has shared that with me. There is some mental

illness going on here that makes it difficult, if not impossible, for [defendant] to assist his attorney in a sentencing."

The court did not find a *bona fide* doubt of fitness at that point, but the court ordered "that the Probation Department have a psychological evaluation done to include fitness factors."

¶ 57 On March 28, 2022, the trial court held a fitness hearing. The court heard testimony from Dr. Anthony P. Latham. Dr. Latham testified that he had completed two different evaluations of defendant—a psychological evaluation dated October 12, 2021, and a fitness evaluation dated December 2, 2021. Dr. Latham also reviewed the evaluations previously submitted by Dr. Hanlon and Dr. Anast, as well as police reports. Dr. Latham observed "some deterioration among the evaluations that [he] reviewed through the evaluations that [he] conducted" and that defendant "had been incarcerated in the jail for sometime [*sic*] before [he] saw him." Defendant was focused on the terrorism issue and "[h]is thought processing and speech would invariably resort to issues of terrorism." Dr. Latham opined that defendant was unable to assist in his defense and lacked understanding of the nature and purpose of the legal proceedings. Dr. Latham recommended that the court find defendant unfit until he received fitness restoration treatment. He opined that, with such treatment, there was a "fair or substantial probability [defendant] can be restored to fitness with [*sic*] one year's time."

¶ 58 The trial court found defendant unfit for sentencing. The court noted that defendant's mental state had deteriorated and that it was not what it was at the time of trial. The court stated:

"During the pendency of the trial, during the many hearings I had, during the long trial, at that point there was never any indication or suggestion that I saw or from anywhere else that the defendant was not fit to stand trial. One of the reasons why the facts of the case do bleed over into this is because this issue of terrorism did come up during the trial,

it was part of the post-trial motion and once again these are in my opinion two different things because I do believe that the defendant's symptoms as the doctor said deteriorated. ***.

* * *

*** Dr. Latham was pretty clear in saying he believed [defendant's] symptoms have worsened and that his mental state has deteriorated and I agree with that, I think his mental state has deteriorated, it is not what it was prior."

The court ordered that defendant be transferred to the custody of the Illinois Department of Human Services to determine if he could be restored to fitness within one year.

¶ 59 In January 2024, defendant was found restored to fitness and remanded back to the Lake County jail for sentencing proceedings.

¶ 60 D. Posttrial Motion for Retrospective Fitness Hearing

¶ 61 Prior to defendant being restored to fitness, on September 8, 2023, Stone filed a "Motion for a Hearing to Determine Fitness at the Time of Trial" (motion for a retrospective fitness hearing). Stone contended that, because the trial court had learned of facts relating to defendant's fitness after his conviction, the court must now determine whether there was a *bona fide* doubt of defendant's fitness at the time of trial.

¶ 62 On April 10, 2024, following arguments on defendant's motion for a retrospective fitness hearing, the trial court denied the motion. The court noted that it found no new evidence that would lead it to believe that there may have been a *bona fide* doubt of defendant's fitness at the time of trial. The court commented regarding its finding of a *bona fide* doubt as to fitness for sentencing. The court referenced the letters that defendant had written to the court and Stone, noting that they "indicated significant paranoid ideation." The court stated further:

"I'm not saying whether I believed that he believed those things, but they did say that.

But my main concern was that if he believed that the [c]ourt and his attorney were conspiring against him, that might be a legitimate *bona fide* doubt. And that's what I found in an abundance of caution, where he was indicating that Mr. Stone was conspiring against him somehow.

But I did get a peek at how he was prior to that from several different ways. Number one, I actually presided over the bond hearing in this case. [Defendant] was in front of me literally probably a couple hundred hours. At no point did I ever indicate or see any sign, even a slight sign that he was unable to understand the proceedings or that he was unable to cooperate with counsel, which was verified by Mr. Zeit's testimony, which was verified also by the evaluations, which did discuss that they believed that whatever occurred while in jail possibly regarding if he really does have paranoid ideation could have been accelerating due to his incarceration and also the evidence that I heard during the trial.

And so based on all of those things I do not find that I've—that there was a *bona fide* doubt then. I was fully aware, as I discussed and have discussed now several times, the role I believe these ideations may or may not play.

Keeping in mind, once again, even if he was, in fact, going through a paranoid ideation during the days preceded [*sic*] the crime or during the crime does not necessarily mean that he was unable to cooperate with counsel or that he did not understand the proceeding.

I have seen no evidence or the period of time and nothing that has changed my mind; therefore, the motion is denied."

¶ 63                                        E. Sentencing

¶ 64    On October 1, 2024, the trial court sentenced defendant to concurrent prison terms of 18 years for home invasion and 1 year for unlawful possession of a controlled substance, to be served at 50 percent. Following the denial of his post-sentencing motion, defendant timely appealed.

¶ 65                                II. ANALYSIS

¶ 66    Defendant contends that (1) trial counsel was ineffective for failing to investigate defendant's mental health before trial and (2) the trial court erred by denying defendant's motion for a retrospective fitness hearing. We address each argument in turn.

¶ 67                    A. Ineffective Assistance of Counsel

¶ 68    Defendant contends that he received the ineffective assistance of counsel because trial counsel failed to investigate his mental health issues before trial, despite recognizing that mental health issues may have been present. According to defendant, had trial counsel obtained a mental health evaluation, they could have (1) "moved for a fitness hearing," or (2) "asserted affirmative defenses (*i.e.*, insanity)."

¶ 69    In response, the State contends that (1) defendant has forfeited any claim based on trial counsel's failure to raise a *bona fide* doubt of defendant's fitness to stand trial, because this argument was not raised in his posttrial motion, and (2) trial counsel made a sound strategic decision not to pursue an insanity defense, which, in any event, would not have changed the outcome of the trial.

¶ 70    First, we agree with the State that defendant has forfeited any argument based on counsel's failure to raise a *bona fid*e doubt of defendant's fitness to stand trial. To preserve an issue for appeal, a defendant must typically raise it in both an objection at trial and a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The failure to do so constitutes a forfeiture of the issue on appeal. *Id.* Trial counsel is not expected to argue their own ineffectiveness in a posttrial motion;

- 29 -

however, if a different attorney drafts the posttrial motion, normal forfeiture rules apply. *People v. Ramos*, 339 Ill. App. 3d 891, 900 (2003).

¶ 71    Here, in his supplemental motion for a new trial, defendant claimed that trial counsel was ineffective for failing to investigate and present an insanity defense at trial. Defendant did not claim that his trial attorneys were ineffective for failing to argue a *bona fide* doubt of defendant's fitness to stand trial. In fact, defendant expressly noted in his supplemental supporting memorandum that he was not making that argument. Defendant argued: "The *bona fide* doubt standard exists only in the issue of an accused's fitness for trial. Of course, one can be 'fit' and yet be insane." Defendant clarified: "We are not challenging [defendant's] fitness to be tried." Defendant also emphasized: "The current question is whether [defendant's] counsel failed to investigate the defense of insanity, and thereby deprived [defendant] of his right to effective assistance of counsel." Accordingly, defendant has forfeited any argument based on a failure to raise a *bona fide* doubt of defendant's fitness for trial. See *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 136 (where the defendant, represented by new posttrial counsel, failed to raise part of his ineffectiveness claim in the trial court, that portion of the defendant's claim was forfeited); *Ramos*, 339 Ill. App. 3d at 899-900 (court would not address ineffectiveness argument that the defendant, represented by new posttrial counsel, did not include in his posttrial motions). While the plain-error rule provides an exception to forfeiture, a defendant forfeits even relief under that rule when he does not ask for it. See *People v. Hillier*, 237 Ill. 2d 539, 545, 549 (2010). Because defendant does not invoke the plain-error rule, we uphold the forfeiture of this particular ineffectiveness claim.

¶ 72    We turn now to the ineffective assistance claim that was properly preserved—*i.e.*, that trial counsel was ineffective for failing to investigate defendant's mental health and present an insanity

defense. In support of his claim, defendant points to the police reports containing defendant's statements about N.L. being an " 'aggressive Muslim' " and a " 'terrorist' " and that he went to the residence to "retrieve [N.L.'s] computer." Defendant also points to the fact that the police reports include the officer's observation that defendant was speaking "irrationally." According to defendant, there were obvious signs that defendant was delusional, warranting an investigation into his mental health.

¶ 73    We note that defendant raised his claim of ineffective assistance in a motion for a new trial. "We generally review a trial court's decision on a motion for new trial for an abuse of discretion." *People v. Janusz,* 2020 IL App (2d) 190017, ¶ 68. However, where the "core issue" is whether trial counsel was ineffective, we employ a bifurcated standard of review. *Id.* That is, "we defer to the trial court's findings of fact unless they are against the manifest weight of the evidence but review *de novo* the ultimate legal issue of whether counsel's actions support a claim of ineffective assistance." *People v. Kline*, 2024 IL App (1st) 221595, ¶ 65.

¶ 74    Illinois courts evaluate claims of ineffective assistance of counsel under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526 (1984) (adopting the *Strickland* standard). Under the *Strickland* standard, to prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Torres*, 2024 IL 129289, ¶ 27. The failure to satisfy either prong precludes a finding of ineffective assistance. *Janusz*, 2020 IL App (2d) 190017, ¶ 69.

¶ 75    "Trial counsel has a professional duty to conduct 'reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *People v. Domagala*, 2013

IL 113688, ¶ 38 (quoting *Strickland*, 466 U.S. at 691). Counsel's "duty includes the obligation to independently investigate any possible defenses." *Id.* "Lack of investigation is to be judged against a standard of reasonableness given all of the circumstances, applying a heavy measure of deference to counsel's judgments." (Internal quotation marks omitted.) *Id.* "Where the record establishes that counsel had reason to know, from an objective standpoint, that a possible defense, such as insanity, was available, failure to investigate fully can constitute ineffective assistance of counsel." (Internal quotation marks omitted.) *Id.*

¶ 76    Section 6-2(a) of the Criminal Code of 2012 (720 ILCS 5/6-2(a) (West 2018)) sets forth the insanity defense as follows: "A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity to appreciate the criminality of his conduct." Where the defendant raises the defense, "the burden of proof is on the defendant to prove by clear and convincing evidence that the defendant is not guilty by the reason of insanity." *Id.* § 6-2(e).

¶ 77    "A strong presumption exists that trial counsel acted effectively in investigating a case." *People v. Brown*, 2017 IL App (1st) 150203, ¶ 29.

> "Ultimately, any decision of defense counsel to conduct a less-than-complete investigation regarding an issue, including a defendant's mental health, falls within the wide range of professionally competent assistance, so long as this decision is supported by reasonable professional judgment as evaluated from defense counsel's perspective at the time and under all relevant circumstances." *People v. Gale*, 376 Ill. App. 3d 344, 352 (2007).

¶ 78    Here, Douglas Zeit testified at the hearing on defendant's motion for a new trial that he, along with fellow defense counsel, met numerous times with defendant. Zeit testified that they

discussed strategy "[a]ll the time." Zeit also testified that he read the police reports "many times." When asked whether anyone raised "the idea of [an] insanity defense," Zeit stated:

> "We never had an issue with regards to insanity, although a couple of times we thought was there a fitness issue because [defendant] is quite a character. And we discussed with him, amongst ourselves, whether in fact there was a fitness issue, and particularly in light of this terrorist activity of the victim in this matter. *And we came to the conclusion—\*\*\* that because he was such good friends, or at least was at that point, with Dmitry \*\*\*, that that was to try and gain some leverage because of the divorce*." (Emphasis added.)

Zeit stated that, although insanity was discussed as a trial strategy, it "[d]idn't strike [him] that [defendant] was insane." Zeit reiterated: "We talked about a lot of various issues that we thought were trial strategies, and none of us, when we talked about it and batted it around, thought that insanity was a real, live issue under the circumstances."

¶ 79    Trial counsel instead chose to argue that the State could not prove that defendant knowingly entered the house without authority. See *People v. Witherspoon*, 2019 IL 123092, ¶¶ 26, 31 ("[t]he phrase 'without authority' [in the home invasion statute (720 ILCS 5/19-6(a)(West 2014))] means either a violation of a court order or a denial of consent to entry from the occupant" and "include[s] the mental state of knowledge"). Defendant testified that Kepley made keys and gave them to Dmitry, who then gave a key to defendant "[r]ight there on the spot." Kepley also testified that he gave the key or keys directly to Dmitry. Although Dmitry testified that Kepley gave the key to defendant, he also stated that "[e]ventually [Dmitry] gave the key to [defendant]." According to defendant, Dmitry told defendant to keep the key in case he ever wanted to use it and that he could use it whenever he wanted. Defendant testified that the house belonged to Dmitry and that he had no knowledge of any court orders forbidding Dmitry from entering the house. Trial counsel argued

in closing that defendant "believed *** that he had a key that his best friend gave him to the house that his best friend owned and said, 'You can go in here whenever you want to.' And that's what he did." According to Zeit, defendant was involved in the strategy discussions "[o]n several occasions" and defendant approved the defense they ultimately presented.

¶ 80    Zeit's testimony shows that, given all the relevant circumstances, trial counsel's decision to forego conducting any additional investigation into an insanity defense and to instead pursue a defense of consent-to-enter-the-residence was reasonable from counsel's perspective at the time. Clearly, trial counsel did not believe that defendant's terrorist claims were sufficient to warrant further investigation. Indeed, counsel believed that the terrorist claims were an attempt "to try and gain some leverage because of the divorce." To be sure, the trial court rejected the chosen defense. We note, however, that "[a] defendant is entitled to reasonable, not perfect, representation, and mistakes in strategy or in judgment do not, of themselves, render the representation incompetent." *People v. Fuller*, 205 Ill. 2d 308, 331 (2002). "[T]he fact that another attorney might have pursued a different strategy, or that the strategy chosen by counsel has ultimately proved unsuccessful, does not establish" deficient performance. *Id.*

¶ 81    Further, as the trial court found, the facts of this case did not support a defense that defendant "lack[ed] substantial capacity to appreciate the criminality of his conduct." 720 ILCS 5/6-2(a) (West 2018). Thus, trial counsel's failure to pursue and raise an insanity defense did not prejudice defendant. The court noted that defendant's act was "premeditated" and that "everything about the entry into the home was done to avoid detection; and that includes by the police." For instance, defendant did not use his own vehicle or bring his own cellphone. He instructed Voronin to park where the neighbors would not see him. He first attempted to enter the back of the residence, where he would not be seen. And he entered very early in the morning when few people

would be awake. Although defendant claimed that his attempts to avoid detection had nothing to do with the police and that he was instead attempting to avoid detection by the "organization," the court found defendant's testimony incredible. Further, Dr. Hanlon testified that he determined that "[defendant] did not lack substantial capacity to appreciate the criminality of his conduct as a result of a mental disease or mental defect." Although Dr. Anast opined "that [defendant's] delusional and paranoid-type thinking *** played a significant role in his ability to make decisions that potentially led to his criminal behavior," the court took issue with Dr. Anast's "disregard of the substance abuse issue," noting that the court believed that defendant was under the influence of cocaine at the time of the offense. While the court found both doctors credible—in that they were accurately portraying their observations—the court determined that Dr. Hanlon was "far more qualified than Dr. Anast."

¶ 82    Based on the foregoing, we find that, given trial counsel's knowledge of the facts and circumstances of the case, trial counsel made a reasonable strategic decision not to pursue an insanity defense and, further, even if trial counsel had done so, there was not a reasonable probability that the result of the proceeding would have been different. Accordingly, the trial court properly denied defendant's motion for a new trial based on counsel's ineffective assistance.

¶ 83                    B. Denial of Motion for Retrospective Fitness Hearing

¶ 84    Defendant next contends that the trial court abused its discretion in denying defendant's motion for a retrospective fitness hearing. According to defendant, because he was found unfit for sentencing after trial, the court should have held a retrospective fitness hearing to determine whether defendant was fit before trial.

¶ 85    It is a violation of due process to convict a defendant who is unfit to stand trial. *People v. Eddmonds*, 101 Ill. 2d 44, 56 (1984). Under section 104-10 of the Code of Criminal Procedure of

- 35 -

1963 (Code of Criminal Procedure) (725 ILCS 5/104-10 (West 2020)), a defendant is presumed to be fit to stand trial. A defendant will be considered unfit only "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense." *Id.* "When a *bona fide* doubt of the defendant's fitness is raised, the court shall order a determination of the issue before proceeding further." 725 ILCS 5/104-11(a) (West 2020); see *People v. Hanson*, 212 Ill. 2d 212, 217 (2004). Factors relevant to a determination of whether a *bona fide* doubt exists include: "(1) the rationality of the defendant's behavior and demeanor at trial; (2) counsel's statements concerning the defendant's competence; and (3) any prior medical opinions on the issue of defendant's fitness." *Hanson*, 212 Ill. 2d at 223.

¶ 86    Section 104-11(a) of the Code of Criminal Procedure permits a defendant to raise the issue of his fitness "before, during, or after trial." 725 ILCS 5/104-11(a) (West 2020); see *People v. Brown*, 131 Ill. App. 3d 859, 863 (1985).

> "[I]f facts become known to a trial court subsequent to a defendant's conviction on the issue of the defendant's fitness to have stood trial, it is incumbent upon the trial court to exercise its discretion to determine whether there is a *bona fide* doubt that the defendant was unfit to have stood trial." *Brown*, 131 Ill. App. 3d at 864.

"The determination of whether a *bona fide* doubt of a defendant's fitness exists rests within the sound discretion of the trial court who is in a superior position to observe the defendant and evaluate his conduct." *Id.* The trial court's refusal to hold a fitness hearing will not be overturned absent an abuse of that discretion. *People v. Rice*, 257 Ill. App. 3d 220, 223 (1993). "The threshold for finding an abuse of discretion is high and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable, or that no reasonable person would

have taken the view adopted by the trial court." *People v. One 2014 GMC Sierra*, 2018 IL App (3d) 170029, ¶ 24.

¶ 87 Based on the relevant factors, we find no abuse of discretion. Defendant's trial began in February 2019 and concluded in May 2019. Defendant testified in his own defense at trial. He answered questions appropriately and clearly; there was no indication that he was having any difficulties or struggling in any way. Douglas Zeit testified in July 2021 that, during his representation of defendant, he "did not believe there was any fitness issue whatsoever." Stone, too, apparently did not believe trial fitness was an issue. In August 2021, following the hearing on defendant's motion for a new trial, Stone expressly stated: "We are not challenging [defendant's] fitness to be tried." We note that Stone's decision to not challenge defendant's fitness to stand trial was made *after* hearing testimony from Drs. Anast and Hanlon, who evaluated defendant for purposes of his motion for a new trial, as well as from defendant. Had Stone had any concerns regarding defendant's fitness to stand trial based on the medical evaluations, he surely would have raised them at that time.

¶ 88 To be sure, on March 28, 2022, the trial court concluded that defendant was unfit for sentencing at that time. The court made its conclusion after hearing testimony from Dr. Latham regarding his October and December 2021 evaluations of defendant. In finding defendant unfit for sentencing, the court emphasized that Dr. Latham's subsequent evaluations evidenced a deterioration in defendant's mental health after trial and noted that, "*[d]uring the pendency of the trial*, *** there was never any indication or suggestion that [the court] saw or from anywhere else that the defendant was not fit to stand trial." (Emphasis added.) When the court denied defendant's motion for a retrospective fitness hearing, the court provided further explanation as to why it had determined "in an abundance of caution" that defendant was not fit for sentencing. The court stated

that its "main concern" in determining that defendant was unfit to be sentenced stemmed from defendant's "significant paranoid ideation" and belief "that the [c]ourt and his attorney were conspiring against him" as evidenced in letters written by defendant to the court and Stone.

¶ 89     Nevertheless, the trial court found no evidence, given its numerous observations of defendant, that defendant was unfit "prior to that," *i.e.*, at the time of trial. The court stated:

> "I actually presided over the bond hearing in this case. [Defendant] was in front of me literally probably a couple hundred hours. At no point did I ever indicate or see any sign, even a slight sign that he was unable to understand the proceedings or that he was unable to cooperate with counsel, which was verified by Mr. Zeit's testimony, which was verified also by the evaluations, which did discuss that they believed that whatever occurred while in jail possibly regarding if he really does have paranoid ideation could have been accelerating due to his incarceration and also the evidence that I heard during the trial."

The court stated further: "[E]ven if he was, in fact, going through a paranoid ideation during the days preceded [*sic*] the crime or during the crime does not necessarily mean that he was unable to cooperate with counsel or that he did not understand the proceeding." The court reiterated that it had "seen no evidence" of that at the time. Our review of the trial transcripts does not lead us to a different conclusion. In any event, as noted, the trial court is in the best position to observe defendant and evaluate his conduct.

¶ 90     Given the above, we cannot say that the trial court's ruling on defendant's motion for a retrospective fitness hearing "was arbitrary, fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the trial court." *Id.*

¶ 91                                     III. CONCLUSION

¶ 92     For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 93    Affirmed.